## AMERICAN HOMINY CO. v. MILLIKIN NAT. BANK.

(District Court, S. D. Illinois, S. D. April 17, 1920.)

No. 15783.

1. **Bills and notes ⬅═6—Draft to fictitious payee payable to bearer.**
   Under Negotiable Instrument Law Ill. § 9, par. 3, a draft drawn to a payee known by the drawer to be fictitious is payable to bearer.

2. **Principal and agent ⬅═119 (1)—Principal has burden of proving limitation on authority of agent.**
   Where an agency to deal with the particular subject of the inquiry is admitted, and a special limitation is relied on to avoid liability for certain acts of the agent, the burden is on the party alleging the special limitation to prove it.

3. **Bills and notes ⬅═296—Drawee paying draft not "holder in due course" as respects right to rely on implied warranties.**
   Negotiable Instrument Law Ill. §§ 65, 66, providing that indorsers warrant the genuineness and validity of the instrument to all subsequent holders in due course, do not apply to the drawee of a draft, to whom it is presented for payment, who does not become by payment a "holder in due course."
   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Holder in Due Course.]

4. **Bills and notes ⬅═434—Drawee, paying drafts fraudulently drawn by its agent, cannot recover from innocent holder.**
   Plaintiff conducted a grain elevator, which for 10 years was in charge of an agent authorized to buy grain and pay for the same by drafts on plaintiff, each drawn on a form stating the amount and price of the grain for which it was given. During three years, besides drafts legitimately drawn, the agent from time to time made drafts in due form, in all 129, drawn to fictitious payees, whose names he indorsed thereon, in many cases with his own indorsement also. These drafts he negotiated and appropriated the proceeds to his own use, and they eventually came in due course of business to defendant bank for collection, and were by it presented to and paid by plaintiff. *Held*, that defendant was chargeable with no negligence which rendered it liable to plaintiff for the amounts so received but that the latter was not only estopped by its negligence in permitting the business of its agent to go on so long without checking, which would have disclosed the fraud, but also by paying the drafts recognized their validity as between it and defendant.

At Law. Action by the American Hominy Company against the Millikin National Bank. Judgment for defendant.

The American Hominy Company, plaintiff, is a corporation organized under the laws of the state of New Jersey, with its head office at Indianapolis, Ind. The defendant is a banking association organized under the National Banking Act (13 Stat. 99), and is located at the city of Decatur, Ill. For 10 years prior to the commencement of this suit, plaintiff owned and operated a grain elevator at Garber, Ford county, Ill., and during the same time plaintiff maintained a branch office at Decatur, doing business under the name of

---

⬅═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Suffern-Hunt Mills, Branch American Hominy Company, and owned and operated several other grain elevators in Central Illinois. During all that time one John C. Meyer was the local managing agent of the elevator and business of buying and shipping grain at Garber, and was authorized to buy grain and pay for the same with drafts drawn by him upon the plaintiff in the following printed blank form, which were furnished Meyer in book form by plaintiff; each blank being numbered consecutively:

"Suffern-Hunt Mills,                    No. ......
"Branch American Hominy Co.
"White Corn products.              Garber Ill., ......, 191—.
    "Pay to the order of ...... $......, ...... dollars, for ...... bushels ...... at ......
"To Suffern-Hunt Mills, Decatur, Illinois.           ...................,
                                            "Agent."

During a portion of the period mentioned, beginning on June 8, 1914, up to and inclusive of the 5th of June, 1917, among others, Meyer issued the 129 drafts sued upon in this case. Each one was signed by John C. Meyer on the line above the word "Agent." None of the drafts mentioned was ever delivered to or indorsed by the payee named, and it was never intended by John C. Meyer that any such payee should have any interest in or to any of the drafts, or any part thereof, nor that any payee in any of them should have any notice or knowledge of the making, issuing, or negotiation of the said drafts, and, in fact, none of the payees named in any of them had any interest in them or the proceeds thereof.

After the drafts were drawn, and before negotiation, the name of the payee in each was written across the back by John C. Meyer, without any authority from the named payee. In some instances Meyer wrote his own name under the purported indorsements of the payee. Afterwards the drafts were negotiated by Meyer without the actual knowledge of plaintiff or defendant that the respective payees had not received nor indorsed said drafts, and in the regular course of business they were received by defendant, and by it presented to plaintiff for payment and paid. Plaintiff first obtained actual knowledge of the writing of payees' names by Meyer upon the back of the drafts in June, 1917, and gave notice to defendant that it had discovered that the names of the payees on many of such drafts had been forged, and that the proceeds thereof were not received by the payee, nor used for the payment of grain, but were misappropriated. A list of the drafts was inclosed, and defendant was notified that the plaintiff would hold it responsible for the wrongful collection of the drafts, and demanded repayment of the amount collected upon them. Afterwards, November 7, 1917, a formal tender of the drafts in question was made to the defendant.

The drafts in question were usually negotiated by Meyer at the banks at Gibson City, and reached defendant through correspondents either in Chicago or Bloomington. A number of drafts were negotiated by Meyer through one G. G. Eddy, engaged in the speculative grain business at Paxton, and some through Bennett & Co., Board of Trade operators in Chicago. As the drafts reached defendant in the regular course of business, each would be presented to the plaintiff for payment at its branch office in Decatur. The officers of plaintiff would take each draft, check it up with the daily report of Meyer, make such other investigation as they cared to make, and then issue plaintiff's check in payment thereof.

During the period covered by the transactions involved in this case, a representative of the plaintiff called several times at the elevator at Garber to discuss repairs, etc. It was reported to the officers of plaintiff at Decatur that Meyer was speculating on the Board of Trade. The company's cashier asked him about it, and was informed by Meyer that he had had a few trades, but that they were then all closed. Also that in several instances Meyer had offered to pay farmers in excess of the market price for their grain, if they would wait some time after delivery for their pay; that he was storing grain in the elevator in violation of the regulations of Illinois. It was known to the officers of the plaintiff that Meyer was conducting a small general store on his own behalf, in addition to the grain-buying business,

and he was notified by the company that, if he was cashing customers' drafts in his store, he issue his own checks for the balances. At no time during the period involved in this case was the amount of grain in the elevator checked up to see if the proper amount was there, nor was any particular draft checked up with the scales record to see whether or not the amount of grain purporting to have been paid for by it was received by Meyer.

The last draft sued upon was issued June 5, 1917; W. E. Lipe was named as payee, for $2,337.60, and purported to have been issued in payment "for 1612-$\frac{8}{2}$-bu. white corn at 1.45 bu." The draft was indorsed "W. E. Lipe," and beneath the indorsement was the notation in ink, "Dep to credit of John C. Meyer WAD," evidently the notation of the bank at Gibson City that the amount of the draft had been deposited to the credit of Meyer.

George B. Gillespie, of Springfield, Ill., and Vail, Pogue & Allen, of Decatur, Ill., for plaintiff.

Le Forgee, Black & Samuels, of Decatur, Ill., and Barry & Morrissey, of Bloomington, Ill., for defendant.

FITZHENRY, District Judge (after stating the facts as above). It is not contended, in this case, that Meyer did not have authority to draw drafts in exactly the same form as the drafts sued upon. In fact, it is a fair inference that during the period covered by the fraudulent transactions involved here, June, 1914, to June, 1917, Meyer drew hundreds of drafts in identically the same form, so clearly so that plaintiff accepted and paid the bad ones with the good, throughout the entire three-year period. The series of frauds finally being discovered and the extent of them ascertained, suit was brought against defendant, the presenting holder, to recover the moneys of which plaintiff had been defrauded by its agent.

[1] Much depends upon the legal effect of the acts or omissions of the several parties involved. Upon inquiry it has been established, and has been so stipulated, that Meyer, the drawer and maker of the several drafts in question, made each of the fraudulent drafts payable to the order of a person known to him to be fictitious or nonexistent, or of a living person not intended to have any interest in them. Each draft was drawn, negotiated, and paid in Illinois. So the legal effect of what Meyer did was, and must be so held, to make them and each of them payable to bearer. Illinois Negotiable Instrument Law, c. 98, § 9, par. 3 (4 J. & A. Ill. Stat. Ann. par. 7648); Bartlett v. First National Bank, 247 Ill. 490, 93 N. E. 337; American Hominy Co. v. National Bank of Decatur, 215 Ill. App. 464; United States v. Chase National Bank, 250 Fed. 105, 162 C. C. A. 277; United States v. Chase National Bank (D. C.) 241 Fed. 535. The Illinois statute, prescribing when an instrument shall be payable to bearer, uses the words, "known by the drawer or maker to be fictitious," etc.; the Uniform Negotiable Instruments Law, in force in New York and many other states, uses the language, "and such fact was known to the person making it so payable." Uniform Negotiable Instrument Law N. Y. § 9, par. 3. The writers of the negotiable instruments statutes undoubtedly sought to avoid the controversy that had developed in England over the meaning of the corresponding provision in the English Bills of Ex-

change Act (Act of 1882, § 7, subd. 3), where this language was used:

"Where the payee is a fictitious or nonexisting person, the bill may be treated as payable to bearer."

It was contended in England:

"The word 'fictitious' must in each case be interpreted with due regard to the person against whom the bill is sought to be enforced. If the obligations of the acceptor are in question the acceptor is the person against whom the bill is to be so treated, fictitious must mean fictitious as regards the acceptor, and to his knowledge." Vagliano Bros. v. Bank of England, L. R. 23 Q. B. Div. 243.

In a case arising in Illinois, prior to the enactment of the Negotiable Instrument Law, the Illinois Supreme Court followed the holding in the Vagliano Case, supra, and applied it. First Nat. Bank v. Northwestern Bank, 152 Ill. 296–309, 38 N. E. 739, 26 L. R. A. 289, 43 Am. St. Rep. 247. However, after the decision in the Vagliano Case, supra, that case was appealed to the House of Lords, and the holding of the lower court upon this question and the judgment were reversed. Bank of England v. Vagliano Bros., L. R. [1891] App. Cas. 107; while the holding of the Supreme Court of Illinois has been superseded by the enactment of the statute and reversed in principle by a later decision, Bartlett v. First National Bank, 247 Ill. 490, 93 N. E. 337.

The latter decision is sustained by the great weight of authority. United States v. Chase Nat. Bank, 250 Fed. 105, 162 C. C. A. 277 (C. C. A. 2d Cir.); Snyder v. Corn Exchange Nat. Bank, 221 Pa. 599, 70 Atl. 876, 128 Am. St. Rep. 780; Bank of England v. Vagliano Bros., L. R. [1891] App. Cas. 107; Trust Co. of America v. Hamilton Bank, 127 App. Div. 515, 112 N. Y. Supp. 84; Phillips v. Mercantile Nat. Bank, 140 N. Y. 556, 35 N. E. 982, 23 L. R. A. 584, 37 Am. St. Rep. 596; Clutton v. Attenborough & Son, L. R. [1897] App. Cas. 90; Coggill v. American Exchange Nat. Bank, 1 N. Y. 113, 49 Am. Dec. 310; Phillips v. Thurn, 18 C. B. (18 J. Scott, N. S.) 694; Kohn v. Watkins, 26 Kan. 691, 40 Am. Rep. 336; Ort. v. Fowler, 31 Kan. 478, 2 Pac. 580, 47 Am. Rep. 501; Lane v. Krekle, 22 Iowa, 399; Farnsworth v. Drake, 11 Ind. 101; Blodgett v. Jackson, 40 N. H. 21; In re Assignment of Pendleton Hardware Co., 24 Or. 330, 33 Pac. 544.

[2] It is contended very ably by counsel for the plaintiff that Meyer, the agent and drawer of the drafts in question, had no authority to draw bearer paper; that if the drafts were payable to bearer, having exceeded his authority as agent, that therefore his acts were void. If there was any limitation upon the power of Meyer as agent for the plaintiff at Garber, Ill., none is shown by the evidence in this case, and plaintiff is bound by the rule that, where an agency to deal with the particular subject of the inquiry is admitted, and a special limitation is relied upon to avoid liability for certain acts of the agent, the burden is on the party alleging the special limitation to prove it. J. L. Mott Iron Works v. Metropolitan Bank, 78 Wash. 294, 139 Pac. 36; Brett v. Bassett, 63 Iowa, 340, 19 N. W. 210; Lowry v. Atlantic Coast Line R. Co., 92 S. C. 33, 75 S. E. 278; Wedge Mines Co. v. Denver Nat.

Bank, 19 Colo. App. 182, 73 Pac. 873. Also the rule that whoever asserts a negative fact to shield himself from liability must establish the truth of the allegation, unless the means of proving the fact are peculiarly within the knowledge of the opposite party. Great Western R. R. Co. v. Bacon, 30 Ill. 347, 83 Am. Dec. 199; Abhau v. Grassie, 262 Ill. 636, 104 N. E. 1020, Ann. Cas. 1915B, 414; Harper v. Fay Livery Co., 264 Ill. 459, 106 N. E. 273.

For ten years prior to the commencement of this suit, Meyer, plaintiff's agent, was authorized to make successive purchases of grain in the locality of his agency, from those who desired to sell, and must be held to have been a general agent. Butler v. Mapes, 76 U. S. (9 Wall.) 766, 19 L. Ed. 822; Mechim, § 6; 2 Kent, 620; United States Life Ins. Co. v. Advance Co., 80 Ill. 549. If an agent acts within the apparent scope of his authority, his principal is bound. Hodges v. Bankers' Surety Co., 152 Ill. App. 372–385.

But plaintiff also contends:

"The drafts were in the semblance of plaintiff's drafts. If they were in fact Meyer's own drafts, then so far as plaintiff is concerned the drafts were all forgeries; that is, the drawers' names were forged. Having paid the drafts, plaintiff cannot urge they are forged. But what is the result? Although the forger of a bill of exchange may intend the payee therein to be fictitious, the payment of such bill by the drawee converts such bill as between all parties thereto into a real bill of the drawer whose name was forged (plaintiff); and since it is the intent of the drawer (plaintiff) only which can make a payee fictitious, the forger's (Meyer's) intent under such circumstances must be disregarded, and the bill deemed as between all parties payable to a real and not a fictitious payee."

To concede the contention of plaintiff in this case, that the drawer's name in each instance was forged, is to bring the case clearly within the case of Price v. Neal, 3 Burrows, 1354 (decided in 1762). That case involved two forged bills of exchange which had been paid by the drawee. Upon discovery of the forgery, the drawee brought an action against the presenting holder, to recover the money so paid. Both parties being admitted to be equally innocent, it was held that the drawee could not recover. Lord Mansfield said:

"Here was no fraud, no wrong. It was incumbent upon plaintiff to be satisfied 'that the bill drawn upon him was the drawer's hand' before he accepted or paid it; but it was not incumbent upon the defendant to inquire into it. Here was notice given by the defendant to the plaintiff of a bill drawn upon him; and he sends his servant to pay it and take it up. The other bill he actually accepts, after which acceptance the defendant innocently and bona fide discounts it. The plaintiff lies by for a considerable time after he had paid these bills; and then when he found out 'that they were forged' the forger comes to be hanged. He made no objection to them at the time of paying them. Whatever negligence there was was on his side."

The principle established in Price v. Neal, supra, has never been departed from by the courts of England, or the federal courts, and by but very few of the state courts. In United States v. Chase National Bank (D. C.) 241 Fed. 535, District Judge Learned Hand said:

"Any holder or the drawer might fill a genuine bill with the names of distinguished persons, and forge their indorsements, without affecting his rights or the drawee's obligation, because the drawee looks only to the drawer, and

to the title of the holder from the person to whom or for whom the drawer actually first delivered the bill. The actual holder may pass his actual title by any name that he has been called in the bill, and he may add any indorsements to real persons whom he chooses, if he avoids delivery to them."

It might as effectively be contended that a recovery should be permitted plaintiff for the reason that it had not authorized its agent to commit forgery.

"It may be quite true that the cashier was not the agent of the bank to commit a forgery, or any other fraud of such a nature; but he was authorized to draw or check upon the bank's funds. If he abused his authority and robbed his bank, it must suffer the loss." Phillips v. Mercantile Nat. Bank, 140 N. Y. 556, 35 N. E. 982, 23 L. R. A. 584, 37 Am. St. Rep. 596.

In paying these drafts, made out and indorsed as they were, plaintiff is so far concluded by its acts as to be estopped from now denying their validity. Phillips' Case, supra.

It is contended that section 9, par. 3, of the Illinois Negotiable Instrument Law, cannot stand as a final pronouncement of the whole law respecting fictitious payee paper, if any other provisions of the Negotiable Instrument Law in any wise modify section 9, and that section 61 of the Statute is a limitation upon section 9. A reading of section 61 discloses that that section does not presume to provide for the contingencies provided for in section 9. Therefore the later section fails to modify the earlier one.

[3] It is also contended that sections 65 and 66 make the defendant here a warrantor of the indorsements of the payees' names to the plaintiff, upon the theory that the person who presents a draft for payment makes the warranties provided in these sections to the drawer, upon the authority of Leather Bank v. Merchants' Bank, 128 U. S. 26, 9 Sup. Ct. 3, 32 L. Ed: 342, which was decided before the enactment of the Negotiable Instrument Law in Illinois.

It must not be overlooked that in this case it is stipulated that the drawer of the several drafts made them all payable to fictitious persons or living persons not intended to have any interest in them, and that it is the intention of the one making the draft which controls, even though he be an inferior officer of the United States and the United States Treasurer is the drawee. United States v. Chase National Bank, 250 Fed. 105, 162 C. C. A. 277 (C. C. A. 2d Cir.). Moreover, the warranties of those two sections run "to all subsequent holders in due course." The plaintiff, the drawee, is not a holder in due course under section 52, nor under the definition contained in section 190. These drafts being payable to bearer, under the statute, presentation for payment to the drawee was not a negotiation. Brannon's Negotiable Instruments Law (3d Ed.) 131, 132.

Section 62, however, does have a direct bearing upon the force and effect to be given to section 9, par. 3; payment in law being equivalent to acceptance, so far as the rights of the drawee or acceptor are concerned. Section 62 provides the acceptor, by accepting the instrument, engages that he will pay it according to the tenor of his acceptance and admits:

"The existence of the drawer, the genuineness of his signature and his capacity and authority to draw the instrument."

Prof. Brannon, in his excellent work, supra, in discussing the construction of section 62, says (pages 225, 226):

"Defendant bank, without negligence, cashed a forged check on plaintiff bank, indorsed it: 'Indorsement guaranteed. Pay any national or state bank or order'—and sent it for collection and it was paid by plaintiff, who, upon discovery of the forgery, sued to recover the money. *Held*, that plaintiff could not recover; that section 62 was intended to adopt the doctrine of Price v. Neal, 3 Burrows, 1354, and applied as well to payment as to acceptance by the drawee of a forged check or bill; also that the indorsement of the defendant bank was not a guaranty to the drawee but only to indorsees"—citing numerous authorities.

[4] Prof. Ames, formerly Dean of the Harvard Law School, in his very able "Comments and Criticisms upon the Negotiable Instruments Law," contained in Prof. Brannon's work, supra, says (pages 419, 420):

"If the acceptor or certifying bank must honor his acceptance or certification in such case, a fortiori a drawee who pays a raised bill or check without acceptance or certification should not recover the money paid from an innocent holder. These results are at variance with numerous American decisions, but they are changes for the better, so far as adopted, bringing the law of this country into harmony with the law of nearly, if not indeed all, of the European states."

Therefore, if Meyer, plaintiff's agent, was acting within the scope of his authority, the instruments in question were all payable to bearer within the meaning of section 9, par. 3, of the Negotiable Instrument Law, and defendant's title was derived through delivery of the several instruments to it. If Meyer exceeded his authority in making the instruments payable to fictitious or persons not intended to have any interest therein, and all of the instruments were forgeries, being in the semblance of plaintiff's drafts, then all of the instruments come within the doctrine in Price v. Neal, supra, and the forged indorsements become immaterial.

"As the bill was a forgery, and created no obligation, it could make not the slightest difference to the drawee what indorsements it bore, or whether or not they were genuine. The bill, being void, could never be presented by the true owner, assuming the payee ever became its true owner. Now, in the case of a genuine bill stolen and forged, the wrong done the drawee, who pays on the forged indorsement, is only that he must pay again, a wrong which cannot arise when the bill is a forgery. Hence the forgery of the indorsement was wholly irrelevant, even if the bill had been stolen from the actual payee." United States v. Chase Nat. Bank (D. C.) 241 Fed. 535–538.

This is an action in assumpsit, under the common counts, for money had and received. The right to recover is governed by principles of equity, although the action is at law. The action is maintainable in all cases, where one person has received money, or its equivalent, under such circumstances that, in equity and good conscience, he ought not to retain it and which ex æquo et bono belongs to another. Highway Commissioners v. City of Bloomington, 253 Ill. 164–174, 97 N. E. 280, Ann. Cas. 1913A, 471; Donovan v. Purtell, 216 Ill. 629, 75 N. E.

334, 1 L. R. A. (N. S.) 176; First National Bank v. Gatton, 172 Ill. 625, 50 N. E. 121.

In determining the equities in this case, it must be considered that there is no suggestion of negligence on the part of the defendant and that the presenting holder or indorsee is not presumed to have any knowledge of the arrangement between the drawer and drawee. However, the plaintiff, for more than 10 years prior to the commencement of this suit, maintained John C. Meyer as its local managing agent in charge of its elevator, at Garber, Ill. All of the plaintiff's business, of buying and shipping grain at and from that point, was transacted for it by Meyer. He paid for the grain he bought with drafts drawn by him, as agent, upon the plaintiff as drawee, under the name of Suffern-Hunt Mills, Branch American Hominy Company. Each draft was a plain order to pay money. However, there were blank spaces provided upon the face of each draft, which, when filled by Meyer, showed the amount, kind of grain, and price per bushel for which each draft was supposed to have been issued. Meyer made daily reports of his purchases, and when the various drafts were presented by the defendant for payment they would be paid, upon checking them up with the daily reports.

At no time before the issuing of the first and last drafts sued upon in this case was any inspection made of the grain in the elevator, or of the grain received and weighed as shown by the scales record, to ascertain whether or not Meyer had received the grain for which he had issued drafts. A checking up of any of the drafts at any time with Meyer's records and the grain in the elevator in all probability would have disclosed the fraud. The plaintiff was at liberty to make this investigation; the defendant was not and could not have done so.

There are 129 drafts sued upon in this case, aggregating the sum of $52,449.21; the first, No. 2173, dated June 8, 1914, purporting to be indorsed in blank by the payee, and the second, No. 2185, dated July 7, 1914, purporting to be indorsed by the payee in blank and by John C. Meyer. Of the 129 drafts, 73 bore the name of John C. Meyer beneath the apparent indorsement of the payee named. One draft was indorsed in the name of the payee "per John C. Meyer." The other 55 bore the apparent indorsements of the payee named, written almost invariably with an indelible pencil. As late as May 21, 1917, Meyer issued draft No. 2898 to Herman Hoffman for $1,318.05. On the back of that draft, under the purported indorsement of the payee, was written the name of John C. Meyer. On June 5, 1917, he issued draft No. 2908 for $2,337.60, on which, below the apparent indorsement of the payee, was written "Dep to credit of John C. Meyer WAD," evidently the notation of the banker with whom it was negotiated. Drafts Nos. 2195, 2244, 2275, 2523, 2613, 2875, 2795, 2651, 2584, 2754, 2806, 2815, and 2835, all purporting to have been indorsed by the payee, were negotiated with one G. G. Eddy, who indorsed and cashed them at the First National Bank at Paxton, Ill., where Mr. Eddy was engaged in the speculative grain business. The first of the Eddy drafts was dated July 29, 1914. Three drafts, Nos. 2781, 2782, and 2784,

after having the names of the payees written upon the backs of them by Meyer, were negotiated with James M. Bennett & Co., Board of Trade operators in Chicago. One of these drafts was sent by Bennett & Co. to its local representative at Decatur, who presented it at the plaintiff's offices and asked if it (Bennett & Co.) could use the draft in its business; the character of Bennett & Co.'s business being known to the officers of plaintiff. He was told it might do so, and it did. It was reported to plaintiff's representative at Decatur that Meyer was speculating on the Board of Trade; a representative called to see Meyer, and asked him if that was true; he said he had had some trades, but they were all closed.

Plaintiff was bound to know the signatures of Meyer, and its officers and agents at Decatur certainly did know it. To one familiar with his handwriting, the similarity in the writing of the indorsements of the payees' name to the names as written in the bodies of the drafts might be suggested, while a stranger would not be likely to have his suspicions aroused. But, aside from that, it is perfectly apparent that an occasional checking up of Meyer's transactions undoubtedly would have shown the truth. In the diligent prosecution of its business, plaintiff should have done this. After permitting Meyer to run its business with a free hand all the years covered by these drafts, and paying them upon presentment, plaintiff cannot now be permitted to dishonor them.

"The presentment of a bill to the drawee is a direct appeal to him to sanction or repudiate it. It is an inquiry as to its genuineness, addressed to the party, who, of all men, is supposed best able to answer it, and whose decision is most satisfactory. He is, moreover, the person to whom the bill itself points, as the legitimate source of information to others and if he were permitted to dishonor a bill after having once honored it, the very foundation of confidence in commercial paper would be shaken. There is a wide difference between such a transaction and the passing of paper as a representative of money, between persons equally strangers to it, in the ordinary course of business. In the latter case the receiver relies in a measure upon the paper, while in the former the case is reversed, and the holder relies, and has a right to rely, upon the decision of him to whom the bill is addressed, and who alone is to determine whether it shall be honored or not." Bank of St. Albans v. Farmers' & Mechanics' Bank, 10 Vt. 141–145, 33 Am. Dec. 188.

The rule is that, where one of two persons must suffer loss, he who by his negligent conduct made it possible for the loss to occur must bear it. Whatever neglect there was, was on plaintiff's side. Price v. Neal, 3 Burrows, 1354. It is his duty to use reasonable and ordinary precaution to avoid imposition, for it is against reason that a party who stands fair should suffer for the negligent conduct of another. Anderson v. Warne, 71 Ill. 20–23, 22 Am. Rep. 83; Keohane v. Smith, 97 Ill. 156–159; Miller v. Larned, 103 Ill. 562–581; Bartlett v. First Nat. Bank, 247 Ill. 490–498, 93 N. E. 337; Straus v. National Bank, 163 Ill. App. 310; Armour & Co. v. Greene County State Bank, 112 Fed. 631, 50 C. C. A. 399 (C. C. A. 7th Cir.).

In the latter case, Morelan, the agent of Armour & Co., issued checks supposedly in payment for the purchase of grain. A portion of the checks in question bore the indorsement of Morelan himself, just as in

this case 74 of the drafts in question bore the indorsement of Meyer, plaintiff's agent. The United States Circuit Court of Appeals of this circuit said:

"If this was irregular, the bank should have been notified by Armour & Co. as soon as the practice began. In the absence of such notice, Morelan's indorsement was in effect a certificate by the drawer of the genuineness of the indorsement of the payee. The bank, so long as it acted in good faith, could not be expected to look beyond such a certificate."

The Court of Appeals continues:

"Nor were Armour & Co., in another respect, without fault. The checks each bore a memoranda of the amount of purchase. The period over which they ran was from October to April. [In this case from June 8, 1914, to June 5, 1917.] The truthfulness of the memoranda could have been tested at any time by inspection of the corn in the cribs. Such inspection was within the power of Armour & Co., but not within the duty undertaken by the bank. A failure to make it by the former, at apt times, lies at the bottom of this loss; and its consequence ought not to be visited upon the bank. Of course, if the relationship between the parties was that of banker and depositor, these facts relating to negligence are largely immaterial. But, in our opinion, such legal relationship is not applicable to the transactions under consideration. Clearly, a deposit for safe keeping was not intended, except to the extent of making the bank Armour & Co.'s disbursing agent. The transaction more nearly resembles the drawing of inland bills of exchange; in which case, it is well settled, that the drawee cannot recover back money paid to the holder"—citing Hortsman v. Henshaw, 11 How. 177, 13 L. Ed. 653.

The following language from the opinion of the Circuit Court of Appeals is particularly apt in this case:

" * * * The bank was therefore guiltless of negligence, and laying aside, for the time, any consideration of Armour & Co.'s negligence, the case is one where one of two innocent parties, standing in equal relation as to obligation, must suffer through the fraud of the third. By a familiar maxim of law, the loss in such case must fall upon Armour & Co., who, by their selection of Morelan in the first instance, made the loss possible."

Plaintiff contends that Armour v. Greene County State Bank, supra, is not, and ought not to be considered as, an authority in this case, for the reason that the relationship of the litigants in that case was not identical with that of those in the case at bar. The opinion of the Circuit Court of Appeals is in itself a sufficient answer to this contention, where it was said that, while the relationship between the parties in that case was that of banker and depositor, yet "the transaction more nearly resembles the drawing of an inland bill of exchange," and then proceeded to apply what the Circuit Court of Appeals considered the law of this circuit with reference to inland bills of exchange (112 Fed. 633, 50 C. C. A. 399), making the Armour Case clearly an authority in the case at bar, and especially so as to the equitable principle therein announced.

The court finds the issues for the defendant; and it is so ordered.