BARTON· H. KUHNS, TRUSTEE, APPELLANT, v. LIVE STOCK NATIONAL BANK OF OMAHA, APPELLEE.

289 N. W. 893

FILED JANUARY 26, 1940. No. 30715.

*Young & Williams,* for appellant.

*Dorsey & Baldrige* and *Crofoot, Fraser, Connolly & Stryker, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and JOHNSEN, JJ.

PAINE, J.

This is an action at law, in which Barton H. Kuhns, plaintiff-appellant, as trustee in bankruptcy of Central Bridge & Construction Company, a bankrupt corporation, seeks to recover from the Live Stock National Bank of Omaha the sum of $15,000, being the amount of funds of the said construction company which Elmer G. Risk, its president, transferred to said bank in payment of his personal notes. Both sides moving for a directed verdict, the trial court dismissed the jury, and rendered judgment for the defendant bank, from which the trustee appeals.

Plaintiff trustee filed a petition in the district court for Douglas county on February 26, 1938, alleging that the Central Bridge & Construction Company, a Nebraska corporation, was adjudicated a bankrupt on March 9, 1937, in the United States district court for the district of Nebraska, Lincoln division; that on April 16, 1937, the plaintiff, Barton H. Kuhns, was duly elected and qualified as trustee of said bankrupt estate; that on the date of the adjudication in bankruptcy of the Central Bridge & Construction Company, Elmer G. Risk was, and for many years had been, president and a member of the board of directors of said corporation, and M. E. Carman had been secretary and a member of the board of directors.

Plaintiff further alleged that on January 12, 1937, the Central Bridge & Construction Company deposited with the defendant bank $19,215.39 of its own funds, which defendant bank placed to the credit of the Central Bridge & Construction Company in its open checking account; that the next day, January 13, 1937, Elmer G. Risk and M. E. Carman did wrongfully and unlawfully, and without the authority of the Central Bridge & Construction Company or its board of directors, withdraw and divert from the corpo-

rate funds so deposited the sum of $15,000, which on said day the said Elmer G. Risk turned over to the defendant bank in payment of a personal debt which he owed the said bank, which debt had not yet become due.

Plaintiff further alleged that the bank, knowing said funds to be the property of said corporation and said debt to be the personal debt of said Risk, participated in and benefited by said wrongful and unlawful diversion of corporate funds by receiving the same in payment of Risk's personal debt to the bank, this diversion of funds being made by means of a check dated January 12, 1937, and signed by M. E. Carman, secretary of the Central Bridge & Construction Company, upon its checking account in said bank for the sum of $15,000, payable to the order of E. G. Risk, and by him indorsed to the order of the Live Stock National Bank, which received said check and retained the proceeds thereof out of said corporate funds of the Central Bridge & Construction Company.

It is further alleged in said petition that said diversion and misappropriation of corporate funds was in fraud of the rights of the then existing creditors of the Central Bridge & Construction Company, the said company being insolvent at that time and owing debts which exceeded the value of its assets by more than $100,000; that plaintiff trustee has demanded payment of said sum, of which the bankrupt and its estate were so unlawfully deprived, and said payment was refused, and no part of said sum has been paid, for which reason the plaintiff trustee asks judgment against the defendant bank in the sum of $15,000 with interest at 6 per cent. from January 13, 1937.

The defendant bank filed its amended answer on January 18, 1939, admitting that the Central Bridge & Construction Company was adjudged bankrupt, and that the plaintiff is trustee of its estate; that Elmer G. Risk was president and M. E. Carman secretary of said corporation, and that it deposited $19,215.39 of its own funds in said bank on January 12, 1937.

For further answer, said defendant bank alleges that the

Central Bridge & Construction Company, located at Wahoo, Nebraska, opened a checking account in said bank on July 28, 1932, its signature card authorizing checks on its corporate funds to be drawn on the signatures of the following officers: E. G. Risk, president, W. G. Johnson, vice-president, and M. E. Carman, secretary; that on January 8, 1935, the board of directors of said depositor corporation adopted a resolution, which is set out in full as exhibit A, attached to the amended answer, which duly authorized the three officers of said corporation hereinbefore named, or either of them, to borrow money and execute promissory notes of said corporation and pledge its personal property as security for the payment of said notes, to discount bills of exchange, sign and deliver checks and drafts of the corporation upon said bank, and, quoting from the last paragraph of exhibit A, "said Live Stock National Bank is authorized to honor and pay checks or drafts so signed or drawn by them, or either of them, including drafts or checks to their own order, and said bank shall not be responsible or liable in any event for application of funds paid or withdrawn thereon."

Defendant further alleges that said signature cards and resolution, as set out herein, remained in full force and effect on and after January 12, 1937, when the check for $15,000, payable to the order of E. G. Risk, was drawn and signed by M. E. Carman, secretary, and said bank received the same by mail on January 13, 1937, indorsed on the back, "Pay to the order of Live Stock National Bank, E. G. Risk," inclosed in a letter written on the letterhead of the Central Bridge & Construction Company, of Wahoo, Nebraska, dated January 12, 1937, and, as set out in paragraph 4 of the answer, reading as follows:

"Central Bridge & Construction Co.
Wahoo, Nebraska

January 12, 1937

Live Stock National Bank,
Omaha, Nebraska.

Attention: Alvin E. Johnson, Pres.

Gentlemen:

I am herewith enclosing check for $15,000.00 in payment of my two notes of $7,500.00 each.

You may credit the unearned discount to my account.

Very truly yours,

Elmer G. Risk"

Said bank further alleges that it was without knowledge or notice of any fact or circumstance with respect to the financial arrangements or obligation between the depositor corporation and E. G. Risk, or anything from which to deduce, know, or surmise that Risk was not entitled to the amount of said check from said corporation, and said bank was bound by its contract to act as it did with regard to said check and the proceeds thereof; that said bank mailed its monthly statement to the Central Bridge & Construction Company at its office in Wahoo, Nebraska, on February 1, 1937, which account showed a balance of $4,433.96 after payment of the check of $15,000 on January 13, 1937, and that at no time thereafter did the corporation, or any of its officers or agents, protest the payment of said check of $15,000, and therefore the plaintiff, as its trustee in bankruptcy, is estopped to claim that said $15,000 check was not a proper and authorized debit against said corporation's checking account, as defendant bank had no notice that said depositor corporation was insolvent, or in financial difficulty, or of anything relating to its internal affairs at the time said check was presented for payment and charged against the account, nor at any time until after bankruptcy proceedings were instituted, and therefore the defendant bank prays that the petition be dismissed.

To this amended answer plaintiff trustee filed a reply, admitting that the signature cards and resolutions were duly signed as set out in exhibit A, attached to the amended answer, and alleges that the resolutions were in language prepared and selected by the defendant bank, and denies that there was any contract between the defendant bank

and the construction company for the use by Risk, or by the defendant bank, of the corporate funds in payment of Risk's personal debts to the defendant bank.

It is further denied in said reply that the defendant bank suffered any damage or detriment by reason of any failure of the bankrupt to complain or protest the payment of the $15,000 check. Plaintiff alleges that the bank made no inquiry from any responsible source as to Risk's authority to use said check in payment of his personal debt to said bank, and if it had made inquiry it would have received the information that Risk had no authority to make such use of corporate funds, and alleges that on February 2, 1937, the affairs of the construction company were turned over to a bonding company which had become a surety for said construction company in its construction business in a sum in excess of $100,000; that both the corporation and Elmer G. Risk were grossly insolvent on January 12 and 13, 1937, and at all times thereafter, and denies the other allegations contained in said amended answer.

On February 6, 1939, said cause came on for trial before a jury, and at the conclusion of the plaintiff's evidence a motion was made by the defendant bank that the court direct the jury to return a verdict in its favor, and on February 8, 1939, the said jury was discharged, and after arguments of counsel the case was taken under advisement by the court.

On February 21, 1939, plaintiff trustee filed a request that the court state in writing the conclusions of fact found separately from the conclusions of law, and on March 11, 1939, a request was filed that the court make special findings of fact, to wit: (1) That the court find that the Central Bridge & Construction Company and Elmer G. Risk were insolvent on January 12 and 13, 1937; (2) that Elmer G. Risk's financial condition was such that on January 12 and 13, 1937, and at all times thereafter, his two notes for $7,500 each to the defendant bank were worthless and uncollectible; (3) that Central Bridge & Construction Company had no authority under its articles of incorporation to

apply any of its funds to the payment of the personal debts of Elmer G. Risk; (4) that neither Central Bridge & Construction Company nor its trustee in bankruptcy received any consideration for the $15,000 check.

On March 11, 1939, request of plaintiff was denied, and a motion for judgment for plaintiff on the pleadings was also denied.

On March 13, 1939, an order and judgment was entered, finding that the allegations of fact of the defendant's amended answer have each and all been established by the evidence, and plaintiff is precluded from relief prayed for in his petition, and that defendant is entitled to a dismissal of the action. Among the findings of fact in said judgment is one finding that E. G. Risk borrowed $7,500 from the defendant bank on December 24, 1936, and on December 31, 1936, borrowed $7,500 more, for which he gave his promissory notes to the defendant bank, and that he placed the sum so borrowed to his personal credit in his deposit and checking account in said bank; that the first of said notes was payable January 23, 1937, and the last of said notes was payable January 30, 1937, and that the two notes were paid off January 13, 1937. The court found that the construction company deposited a check of $19,215.39, drawn to its order by Wachob, Bender & Company on January 12, 1937, and that prior to the deposit of said check the balance in the account stood at $218.57.

The court further finds that the Central Bridge & Construction Company was adjudicated bankrupt on March 9, 1937, and E. G. Risk was adjudicated bankrupt on June 22, 1937, and that no part of the $15,000 represented by said check was repaid to the corporation, or to the plaintiff as its trustee in bankruptcy.

The court further finds that, in dealing with said $15,000 check and the application thereof, the defendant bank relied upon the resolution of the board of directors of said corporation, and made no further inquiry as to its authority, or the right of Risk to so apply the same to his own debts.

The court further finds that plaintiff's request to make

special findings of fact, to the effect that on January 12 and 13, 1937, E. G. Risk had withdrawn more than $80,000, not including the $15,000 check of the funds of the corporation in excess of all credits to which he was entitled, without the knowledge or consent of the directors other than M. E. Carman, and that the other directors of said corporation did not know that Risk and Carman were withdrawing corporate funds for Risk's personal purposes, and did not know of the payment of his notes to the defendant bank by means of the $15,000 check until shortly before the corporation's bankruptcy, should be denied because the evidence upon which said requested findings would be made by the trial court was all based upon evidence objected to by the defendant bank as immaterial and without foundation.

It was therefore ordered by the court that, as the plaintiff had failed to establish a cause of action, and because the defendant bank was fully authorized to charge said $15,000 check to the account of the corporation and apply the proceeds thereof in payment of the personal notes of Risk, as directed by him, the defendant is entitled to a judgment, and the petition of the plaintiff trustee is dismissed.

On March 25, 1939, the motion for a new trial, setting out 26 errors of the court, was overruled, and the plaintiff thereupon appealed.

The principal contention in this case is, whether the all-inclusive resolution, a paragraph of which is set out herein, relieved the bank of all liability in applying a corporation check in payment of its two notes for money loaned to the president of the corporation.

"One accepting corporate checks drawn by an officer in payment of his private obligations must return the proceeds if corporate funds were thereby misapplied." *McCullam v. Buckingham Hotel Co.,* 199 S. W. 417 (198 Mo. App. 107). In the decision it was said: "A bankruptcy trustee may recover corporate funds diverted by an officer for paying his private debts while the corporation was in-

solvent, although many creditors' claims represented by the trustee accrued subsequent to such diversion."

In *Boyle v. Lewiston Trust Co.,* 136 Atl. 292 (126 Me. 74), it was said: "A trustee in bankruptcy represents the creditors and hence is not estopped from recovering corporate funds used to pay an officer's personal obligations, even though the directors or stockholders consented to such payment." This is because the trustee represents the creditors of the corporation and they are not estopped because the directors acquiesced in or consented to such payments.

"Banks, being bound to take notice that county treasurer had no power to borrow money for county or school board thereof, became liable to subrogated surety on treasurer's bond for money loaned by them to treasurer individually, deposited in his accounts as treasurer and later repaid by checks on such accounts, as against contention that loans were to county for county and school board purposes and properly payable out of county funds." *Bank of Giles County v. Fidelity & Deposit Co.,* 84 Fed. (2d) 321.

One of the early cases in Nebraska is that of *Mendel v. Boyd,* 3 Neb. (Unof.) 473, 91 N. W. 860. It was an opinion by Commissioner Barnes, concurred in by Commissioners Oldham and Pound. J. C. Watts, cashier of State Bank of Neola, Iowa, speculated with the funds of the bank until he had used the bank's money to the amount of over $46,000. The plaintiff, Mendel, was one of the bondsmen of Watts, and having paid the losses of the bank was subrogated to the rights of the bank, and brought suit against Boyd on the amount of 19 drafts drawn to the order of Watts, and indorsed by Watts to Boyd for payment of transactions, commonly known as "bucket shop" or board of trade deals, through James E. Boyd, of Omaha. In the trial court a verdict was returned for the defendant, which was reversed and remanded in this court, and it was held: "The broker in such transactions will be held liable to the true owner of the funds, even if he has no knowledge of the ownership thereof." On the second appearance of *Mendel v. Boyd* before this court, 71 Neb. 657, 99 N. W. 493, it was held

that, when it appears that a cashier of a bank has issued drafts to himself for his own private purposes, there is no presumption that they were paid for when issued, and the burden is on the party claiming they were thus paid for to prove it.

The appellee bank in its reply brief says it "does not contend that if it had actual knowledge that this check had been drawn by or on behalf of Risk in order for him to individually use corporate funds and not for proper corporate purposes, appellee could avoid liability merely because Risk himself had not executed the check for the corporation. Appellee merely contends that in regard to this check, first, there was some transaction between the corporation and Risk, and that appellee was not required to inquire into that because of the corporate resolution authorizing and directing the bank to honor checks payable to an officer of that corporation, regardless of how they were applied. The check having validly got into the hands of Risk, it operated as an assignment of the corporate funds held by the bank for the corporation. Thereafter the bank stood on the same footing as any other third party who might have purchased this check from Risk." Again, the bank in its reply brief says: "Not being required to look into how or why this was done, the bank then, like any other innocent third party, could buy this check."

These contentions of the bank imply that the bank contends that it was a holder in due course, but remember, the bank was the drawee, and when it pays a check drawn upon it, then it cannot be a holder in due course.

"The payment of a check by the drawee bank is not a negotiation and does not make the bank a holder within sec. 30. The check is extinguished and cannot be put in circulation again so as to bind the drawer or indorsers. *American Hominy Co. v. Millikin Nat. Bank,* 273 Fed. 550 (Ill.) ; *Aurora State Bank v. Hayes-Eames Elevator Co.,* 88 Neb. 187, 129 N. W. 279; *National Bank of Commerce v. Farmers & Merchants Bank,* 87 Neb. 841, 843, 128 N. W. 522; *Gerlach v. North Texas & S. F. Ry. Co.* (Tex. Civ. App.)

244 S. W. 662." Brannan, Negotiable Instruments (6th ed.) 465, sec. 30.

This same question has been before this court in the case of *National Bank of Commerce v. Farmers & Merchants Bank*, 87 Neb. 841, 128 N. W. 522, in which section 30 of the negotiable instruments law is discussed. The question of what is meant by negotiating an instrument is explained: "If A gives B a check on C bank, and B presents the check at the counter of C, no negotiation is necessary or had; he simply demands and receives payment; but, if B goes to D store and buys a bill of goods and tenders the indorsed check in payment, he negotiates the check. The difference is clear and well defined. The presentation by defendant of the check in controversy, *for payment,* was not a 'negotiation' of the check within the meaning of the statute quoted."

"If a depositor seeks to pay his own debt to a bank by appropriation of funds to his credit in fiduciary capacity, the bank acting as depositary of the trust funds is charged with knowledge of the character of the appropriation and will be compelled to refund, as the bank, in honoring checks payable to itself out of the trust account, participates in * * * committing a breach of trust." *People v. State Bank of Herrick,* 290 Ill. App. 130, 8 N. E. (2d) 71.

"But even if the bank had known that the fund covered by the check constituted a trust in the hands of Mrs. Dunlop, it would not be liable to the owners of the fund merely because it allowed her to deposit the check to her personal account and honored checks drawn against that account, unless it either acquired an advantage or benefit as a result of the diversion of the trust fund or joined in the diversion with actual knowledge that such diversion was intended or was being executed, and thereby become privy to it." *Bank of Vass v. Arkenburgh* (1932) 55 Fed. (2d) 130.

*Bliss v. Live Stock Nat. Bank,* 122 Neb. 668, 241 N. W. 106, is mentioned and referred to in both briefs. The receiver of the First State Bank of Bethany brought an action against its president and vice-president and the Live Stock National Bank of Omaha, Nebraska, for conversion

of the funds of the bank. There was an impairment of the bank's capital to the amount of $4,000, and this amount was borrowed on a note signed by the president and vice-president of the bank as individuals, and the proceeds of the note passed to the credit of the First State Bank of Bethany. A payment of $500 was made, and later the vice-president directed that the note be charged against the account of the First State Bank in the Live Stock National Bank, and the note so paid was returned to the bank. It was held that the Live Stock National Bank, having received payment of the individual note of the president and vice-president of the First State Bank unauthorized from funds of the bank, with knowledge, is liable for the conversion of the amount so paid, and it was held:

"Where the president and vice-president of a bank make an unauthorized payment of their individual debts out of funds of the bank, the bank may recover from the creditor who received the payment with knowledge that it was so paid.

"The fact that the president and vice-president are personally interested in a transaction is sufficient to put the creditor on inquiry as to their authority to pay their individual debts with funds of the bank."

On the second appeal of this case, in 124 Neb. 880, 248 N. W. 645, the holdings were made even more clear.

In a case in which a certificate was signed by the vice-president and secretary of a corporation, reciting adoption of resolution authorizing defendant bank to honor instruments signed by those named therein *without inquiry,* even if drawn to individual order of signing officer, or tendered in payment of individual obligation, it was "*held* not, as a matter of law, to relieve bank from liability for paying corporation's check, drawn by director to himself as payee, where it had knowledge or was charged with notice of director's conversion of proceeds, particularly where certificate was false. In corporation's action against bank, which paid corporation's check, drawn by director to himself as payee, proceeds of which were converted by him, evidence

that bank was put on inquiry by suspicious circumstances *held* to present question of fact for determination of the jury." *Susquehanna Line v. Auditore,* 229 N. Y. Supp. 181 (223 App. Div. 585). In the opinion it is added: "To carry this respondent's argument to its logical conclusion, such a resolution as therein certified justified the bank and relieved it from liability, if it had gone to the extreme extent of participating in a conversion of the plaintiff's funds."

There is merit in the contention that banks are essential factors of modern business life, and their transactions cannot be clogged, or pace slackened, especially in cities, by unwarranted restrictions. However, in the case at bar there was a loss of $15,000 to an insolvent corporation by the wrongful act of its president in paying his private debt to the bank with the funds of the corporation.

The resolution, doubtless furnished by the bank, and adopted by the board of directors of the corporation, was designed to, and would, protect the bank in each and all of the transactions between the corporation and the bank, with perhaps a single exception. In a clear case, such as this, of loss to the corporation and benefit to the bank in the payment in full of its own notes, which were signed by the president of the corporation in his individual capacity, in our opinion the resolution was insufficient to protect the bank. The resolution authorized the bank to pay checks drawn to the order of certain officers of the corporation, including the president. But when the president of the bank received that letter inclosing a corporation check, being used by the president of the corporation to pay his private notes to that bank, it would be perfectly clear that money was being taken out of the corporation's deposit for personal use. We find nothing in the resolution which authorizes this to be done.

We have reached the conclusion, after a careful examination of the authorities cited and many others, that in such a case there was placed upon that bank the duty of inquiry, but the bank made none. If the bank had made inquiry, it would have learned that the president had no authority to

use the corporate funds for payment of his own debts. The bank's position is the same as if it had actual knowledge of such lack of authority, because it is charged with knowledge of the facts which the inquiry would have developed when it receives the entire benefit of the transaction. *W. L. Chase & Co. v. Norfolk Nat. Bank of Commerce & Trusts,* 151 Va. 1040, 145 S. E. 725; *Union Stock Yards Nat. Bank v. Campbell,* 2 Neb. (Unof.) 72, 96 N. W. 608; *Cady v. South Omaha Nat. Bank,* 46 Neb. 756, 65 N. W. 906; *Allen Dudley & Co. v. First Nat. Bank,* 122 Neb. 443, 240 N. W. 522; *Hinds & Lint Grain Co. v. Farmers Elevator Co.,* 99 Neb. 502, 156 N. W. 1045; *People v. Peoples Loan & Trust Co.,* 285 Ill. App. 552, 2 N. E. (2d) 763; *State v. Farmers State Bank of Hadar,* 111 Neb. 585, 197 N. W. 386; *Roe v. Lahaye* (C. C. A. 8) 64 Fed. (2d) 962; *Fehr v. Campbell,* 288 Pa. St. 549, 137 Atl. 113; *Federal Mortgage Co. v. Simes,* 210 Wis. 139, 245 N. W. 169; *Bordy v. Goodman-Buckley Trust Co.,* 131 Neb. 342, 268 N. W. 286; *Fisher v. National Mtg. Loan Co.,* 132 Neb. 185, 271 N. W. 433.

In our opinion, the burden was upon the defendant to show that the president of the corporation had authority to use corporate funds to pay his notes to the bank. This is so because, where the defendant bank gets the money, no notice or knowledge need be shown other than this: The bank's knowledge that corporate funds were being transferred in payment of the officer's debt. The fact of the officer's personal interest in the transaction puts the bank on inquiry and charges it with notice.

The judgment of the trial court, finding that the plaintiff had failed to establish a cause of action and dismissing plaintiff's petition, is hereby reversed, and the cause is remanded for further proceedings.

REVERSED.