FARMERS' LOAN & TRUST CO. et al. v. FIDELITY TRUST CO.[1]

(Circuit Court of Appeals, Ninth Circuit. February 14, 1898.)

No. 371.

1. BANKS AND BANKING—DRAFTS BY AGENT—CERTIFICATE OF DEPOSIT TO AGENT INDIVIDUALLY.

The mere fact that an agent asks for a certificate of deposit in his own name for moneys of his principal is equivalent, nothing to the contrary appearing, to a declaration by the agent that the money is received by him in his individual capacity, for his individual use, and is enough to put the bank on inquiry as to why the agent wanted the certificate so issued, especially where the president of the bank knew the agent to be irregular and unreliable in his business methods.

2. SAME—PREVIOUS DRAFTS.

The fact that previous drafts drawn by the agent, and credited to him as such agent on the books of the bank, or cashed when drawn, had been paid by the principal, did not warrant the bank in issuing a certificate in the individual name of the agent on a draft drawn by him as agent.

Hawley, District Judge, dissenting.

Appeal from the Circuit Court of the United States for the Western Division of the District of Washington.

Crowley & Grosscup, for appellants.

R. G. Hudson and R. S. Holt, for appellee.

[1] Rehearing denied May 20, 1898.

Before ROSS and MORROW, Circuit Judges, and HAWLEY, District Judge.

ROSS, Circuit Judge. This is an appeal from a judgment for $4,641, with costs, rendered against the Northern Pacific Railroad Company and Andrew F. Burleigh, receiver thereof, upon an intervening petition of the Fidelity Trust Company filed in the suit brought by the Farmers' Loan & Trust Company against the Northern Pacific Railroad Company for the foreclosure of certain mortgages. The intervention was based upon a draft drawn April 5, 1895, by one Paul Schulze, as general land agent of the Northern Pacific Railroad Company, upon George S. Baxter, the treasurer of the company, at New York, for $4,200, and cashed by the petitioner in Tacoma, Wash., the day it bore date, upon its presentation at its bank in that city by Schulze. Before the draft was presented for payment in New York, Baxter had ceased to be treasurer of the company. His successor having refused to pay it, the petitioner sought by its intervention payment thereof out of the funds in the hands of the court, which payment was resisted by the receiver on the ground that Schulze had no authority to draw the draft, and that the money paid thereon by the petitioner was not devoted to the uses of the corporation or its receiver, but was wrongfully appropriated to the personal use of Schulze. That the money paid for the draft by the petitioner was appropriated by Schulze to his individual use, and that none of it was ever received by the Northern Pacific Railroad Company, or its receiver, is shown by the evidence, without conflict. The court below, however, gave the petitioner judgment, upon the ground that, by the course of business of the corporation and its receiver, Schulze, as the general land agent of the company, had been held out to the public, and to the petitioner in particular, as clothed with authority to draw such drafts as that in question, and that the railroad company and its receiver are estopped to deny the binding character of the draft in question by reason of three certain other prior drafts drawn by Schulze, as such general land agent, upon Baxter, as treasurer, for certain sums of money, each of which drafts was at the time cashed by the petitioner, and, upon its presentation to the drawee in New York, promptly paid by him. The first of those drafts was drawn September 20, 1894, for $4,925; the second was drawn March 15, 1895, for $3,500; and the third upon April 1, 1895, for $4,700. The first two were presented by the petitioner, and were paid by the drawee, prior to the drawing of the draft in controversy. The third had not been paid by the drawee at the time when the draft in question was presented to the petitioner's bank at Tacoma, and by it cashed, but was paid on the 8th day of April, 1895,—three days after the fourth draft was cashed by the petitioner. It appears from the deposition of Baxter that on May 9, 1892, he wrote to Schulze, saying:

"I understand all the outside land business of the company on the Pacific Coast is in your charge; and before authorizing any further draft for taxes, or any other purpose, I should have notice from you of any draft to be made."

It further appears from Baxter's deposition that when the draft of September 20, 1894, was presented to him in New York, he telegraphed

Schulze to know if it pertained to the company's business, and received the answer that it was personal business, and that when the draft of March 15, 1895, was drawn, Schulze notified him of it by telegraph, and that Baxter answered, saying, "If it is personal, make the money payable to me personally," and that Schulze complied with his direction, by sending him the money at New York to meet the draft when it was presented. When the draft of April 1st was presented, Baxter had ceased to be treasurer of the company, but he paid the same, as he had paid the preceding ones,—evidently from money sent to him by Schulze. Since all of these drafts were drawn by Schulze as general land agent of the company, it thus appears that Schulze's rascality was connived at and aided by Baxter, the treasurer of the company. The petitioner's bank was the depository of the funds of the Northern Pacific Railroad Company at Tacoma, both before and during its receivership. It carried upon its books several accounts with the railroad company, which were not changed after the receivership, except by noting at the head of the accounts the fact of the receivership, with the names of the receivers. Those accounts were a general account, in which was deposited all the receipts of the station agents in Tacoma and the surrounding territory; the land-department account, in which was deposited the receipts of the Northern Pacific land department at Tacoma; the account of the Puget Sound & Alaska Steamship Company, which was controlled by the railroad company; a pay check and voucher account; a certificate account with the freight agent at Tacoma; and an account with Paul Schulze as general land agent of the company. This latter account was entirely separate and distinct from the account of the land department, which was drawn against by the assistant treasurer of the company at St. Paul only. Schulze was empowered to manage and sell all of the lands of the company in Washington, Oregon, and Idaho, and to collect their proceeds. In pursuance of his powers, he drew drafts on the land commissioner and assistant treasurer of the road at St. Paul for moneys with which to pay taxes upon the lands, and for refunding purchase moneys where necessary. He was charged, too, it would seem, with some disreputable work for the road; for it appears from the record that he drew for and disbursed a political "corruption" fund, although it does not appear on whom he drew for the purpose, or how he disbursed the money. It appears, also, that in the year 1888 Schulze drew two drafts for $25,000 and $15,000, respectively, on the treasurer of the company at New York, which were paid; but these drafts were drawn through another bank than that of the petitioner, were never brought to the knowledge of the petitioner, so far as appears, and were drawn under special authority. The only drafts ever drawn by Schulze, as general land agent of the company, on its treasurer at New York, through the petitioner, or through any other medium with its knowledge, so far as the record shows, were the four drafts already mentioned, the fourth of which is the draft in controversy. The first (that of September 20, 1894, for $4,925) was deposited with the petitioner to the credit of Schulze as general land agent, and the amount of it subsequently checked out by him in the same capacity. The second and third drafts (those of March 15, 1895, for $3,500, and April

1, 1895, for $4,700) were cashed by the petitioner over its counter at the time they were respectively drawn. For the fourth draft, with $300 in cash, delivered by Schulze to the petitioner, petitioner issued in his individual name its certificate of deposit for $4,500, which was returned to petitioner the next day by the Bank of British Columbia, with Schulze's indorsement thereon, and paid by the petitioner. If this was all, it would be clear that neither the Northern Pacific Railroad Company nor its receiver is responsible by reason of the draft in question; for it cannot be doubted that ordinarily an agent who undertakes to pledge the security of his principal for his own benefit must show express authority therefor, and that whoever deals with such an obligation does so at his peril. West St. Louis Sav. Bank v. Shawnee Co. Bank, 95 U. S. 557; Chrystie v. Foster, 9 C. C. A. 606, 61 Fed. 551; Anderson v. Kissam, 35 Fed. 699; Mechanics' Bank v. New York & N. H. R. Co., 13 N. Y. 631. The only thing we find in the record that has any tendency to take the present case out of this most salutary rule is evidence to the effect that the petitioner had frequently issued its certificates of deposits in the individual name of the freight agent of the railroad company at Tacoma for moneys of the company deposited by him with the petitioner, and had also on a number of previous occasions issued similar certificates of deposit in the individual name of Schulze for moneys of the company deposited by him with the petitioner. But it hardly needs argument to prove that the defendant had no right to do anything of the sort. There is nothing in the record tending to show any authority in the freight agent at Tacoma, or in the general land agent, to take, for moneys of the company deposited with the petitioner, its certificate of deposit in his individual name, and nothing to show the principal's knowledge of such conduct. The mere fact that such a certificate was asked for, for moneys of the company, was enough to put the petitioner upon inquiry as to why, for moneys of the principal, the agent wanted a certificate of deposit in his own name. For neither of the three previous drafts drawn by Schulze on the treasurer of the company at New York was a certificate of deposit issued by the petitioner. The amount of the first draft, as has been seen, was credited to Schulze, as land agent of the company; and the amounts of the second and third drafts, respectively, were paid to him, at the time they were drawn, over the counter of the bank,—presumably, for his principal, in whose behalf he had made the draft. But when he came to draw the draft in question, which was for $4,200, he added $300 in cash, and asked for and received a certificate of deposit for $4,500 in his individual name. Here was a feature, and a most important one, that did not appear in respect to either of the preceding drafts drawn by Schulze, as general land agent, on the treasurer of the company at New York. When an agent draws a draft in the name of his principal, and receives from a bank the money therefor, the presumption, in the absence of any showing to the contrary, is that he receives the money in the same capacity in which he draws the draft; that is to say, as agent. But when the agent, for such a draft, asks for and receives from the bank a certificate of deposit in his individual name, not only is such bank thereby put upon inquiry as to why, for money of the principal, the

agent wants such certificate in his individual name, but such conduct—nothing to the contrary appearing—is equivalent to a declaration by the agent that the money is received by him in his individual capacity, and for his individual use; for certainly the legal presumption that follows the deposit of money in the individual name of a man is that the money so deposited is the property of the depositor. In the present case that presumption was strengthened by the fact that Schulze added $300 in cash to the draft, and by the further fact that he then had, and for years had had, an account, as land agent of the railroad company, with the bank in question. The record further shows that the president of the petitioner well knew that Schulze was very irregular and unreliable in his business methods, for he himself so testifies; and the president of the petitioner further testifies that he had been, without his knowledge, made by Schulze a trustee in a written instrument concerning some of the railroad lands, by which Schulze sought to secure to himself a large profit out of a sale by him of these lands of his principal. Certainly, under such circumstances as these, it was the duty of the petitioner, before issuing to Schulze a certificate of deposit in his individual name for a draft drawn by him, in his capacity as general land agent of the company, upon its treasurer, to inquire into his authority; and certainly the court cannot assume that such inquiry would have disclosed the necessary authority in the drawer. Judgment reversed.

HAWLEY, District Judge (dissenting). I concur in the general proposition announced in the opinion of the court as to the ordinary powers and authority of an agent,—that, when he undertakes to pledge the security of his principal for his own use, he must affirmatively show express authority therefor. But the question here, as I understand it, does not involve the proposition whether Schulze, simply by virtue of his position, had authority from his principal to do the act in question. I am of opinion that the evidence justifies the findings of the circuit court, to the effect that the Fidelity Trust Company believed, and had the right to believe, that the draft in question, as well as the three other drafts which were paid by the treasurer of the railroad company, was drawn, in the regular course of business, for the use and benefit of the railroad company, and would, as the other drafts had been, be paid by the treasurer thereof, and that it relied upon this understanding and knowledge in cashing the draft, and issuing a certificate of deposit therefor in the name of Schulze; that it did not know, and had no reason to believe, that Schulze intended to convert the same to his own use; that the Northern Pacific Railroad Company, and the receivers thereof, by the appointment of Schulze as general land agent, and the authority conferred upon him thereby, and their dealings through him with the Fidelity Trust Company, and the payments of the drafts drawn by Schulze by the treasurer of the railroad company, induced it to believe that Schulze, as the general land agent, had the power, and was authorized, to draw the draft in question, and to take and receive the money therefor; and that, by holding him out by this general course of dealing, they gave him such apparent authority for that purpose as to justify it in entertaining and acting upon

the belief that he was authorized to perform such acts as their agent. In cases of this character, the question is not what authority was intended to be given to the agent by his principals, but what authority were third persons having dealings with him, justified, from the conduct and acts of the principals, in believing was given to him. The fact and scope of his agency is not, in such cases, to be confined to the actual authority given by the principals to the agent, but courts can look at the knowledge that the principals have or had, or by the exercise of ordinary care and prudence ought to have had, as to what the agent was doing. The general rule upon this subject is clearly stated in Mechem, Ag. § 84, as follows:

"Whenever a person has held out another as his agent authorized to act for him in a given capacity, or has knowingly and without dissent permitted such other to act as his agent in such capacity, or where his habits and course of dealing have been such as to reasonably warrant the presumption that such other was his agent, authorized to act in that capacity, whether it be in a single transaction, or in a series of transactions, his authority to such other to act for him in that capacity will be conclusively presumed, so far as it may be necessary to protect the rights of third persons who have relied thereon in good faith, and in the exercise of reasonable prudence; and he will not be permitted to deny that such other was his agent, authorized to do the act that he assumed to do, provided that such act is within the real or apparent scope of the presumed authority."

It is a well-settled rule of law that, where one of two innocent parties must suffer through the wrongful act of a third party, the one who has enabled such third party to accomplish the wrong must bear the penalty and suffer the loss. The Fidelity Trust Company in the present case appears to have acted in good faith, and was not guilty of any negligence or wrongdoing. It is true that the president of the bank testified that he knew that Schulze, as the general land agent of the railroad company, had been irregular and unreliable in some of his business methods; but the transaction concerning which this testimony was given occurred long prior to the procuring of the drafts drawn by Schulze, which were paid by Baxter as treasurer of the railroad company. The fact that the railroad company and its receivers continued to have faith in Schulze as a business man, and to repose trust and confidence in him, and that the treasurer of the corporation continued to pay drafts drawn by him without any real authority so to do, were of sufficient weight to overbalance the president's personal knowledge of Schulze's irregular and crooked methods prior to that time. When we take into consideration the character of the acts which the railroad company permitted Schulze, their general agent, to do, and that Schulze's unlawful and unauthorized acts were connived at and aided by Baxter, the treasurer of the company, it furnishes sufficient grounds, in my opinion, to have induced the bank to believe that Schulze had authority, not only to draw the draft, but to have it cashed, and the money paid to himself, or deposited to his order, for the benefit of his principals. The rule announced in the opinion of the court requires greater vigilance upon the part of the bank than it exacts from the principal himself, as to the agent's authority, and, in my view of the case, compels the party least at fault to bear the loss. As long as corporations or individuals hold out to the

general public, and to all parties with whom they have dealings, that their agent has authority to do acts beyond the general scope of an ordinary agent's power, and sanction and approve such acts, without interposing objections thereto when brought home to their knowledge, they cannot thereafter raise the objection that the acts performed by him were beyond the ordinary scope of his agency. The usage and custom of the principals in sanctioning and approving the illegal acts of Schulze, or the acts performed by him without any direct authority from them, was calculated to mislead and deceive the public with whom they dealt, and the knowledge of such parties that the agent was unreliable in his business methods cannot be urged as a reason why they should not be bound by such acts. By their own course of conduct they are estopped from raising such a defense. As before stated, it does not appear that the bank had any knowledge that Schulze intended to appropriate the money obtained upon the draft to his own use. The mere fact that he requested the bank to issue to him a certificate of deposit, and that he procured the same, was not of itself calculated to put the bank upon inquiry as to what use he intended to make of the money. If he had authority to draw the draft, he had the power to obtain the money for the benefit of his principals; and, unless the bank had knowledge to the contrary, it had the right, from the previous course of business, to presume and believe that he was acting for his principals in having the draft cashed, and that he intended using that money for his principals, and not for himself. "For the acts of his agent within his express authority, the principal is liable, because the act of the agent is the act of the principal. For the acts of the agent within the scope of the authority which he holds the agent out as having, or knowingly permits him to assume, the principal is made responsible, because to permit him to dispute the authority of the agent in such case would be to enable him to commit a fraud upon innocent persons." 1 Am. & Eng. Enc. Law (2d Ed.) 990, and authorities there cited; 4 Thomp. Corp. §§ 4881, 4993, 5250.