(No. 5276.   July 25, 1929.)

THE WHITE–DULANY COMPANY, a Corporation, Appellant, v. THE CRAIGMONT STATE BANK, a Corporation, Respondent.

[279 Pac. 621.]

John R. Becker and John W. Cramer, for Appellant.

Cox & Martin, for Respondent.

T. BAILEY LEE, J.—The only question here is: Has plaintiff made out a case of conversion? It claims that defendant bank is so liable upon the bare ground that after cashing a draft drawn in its favor upon plaintiff by plaintiff's agent, Goodall, it permitted Goodall to deposit the proceeds in his personal account, thereby becoming a party to misappropriation of trust funds.

There is no whit of proof in the record that defendant bank had actual knowledge that the agent purposed a wrongful application of the money, or any knowledge that would have put it on inquiry, save the bald transaction itself.

Let us re-examine the facts. Plaintiff plead that it had a banking arrangement with defendant whereby the latter was to cash all drafts drawn upon the plaintiff by Goodall for purchases of grain; that Goodall "was not authorized to issue, nor did he at any time issue any draft on this plaintiff, payable to his own order, nor was he at any time authorized to receive or disburse any money belonging to this plaintiff, and that all expenses incurred by him for the use or benefit of this plaintiff, and all compensation due him from time to time were, as said bank well knew, paid by checks issued by plaintiff through other and authorized employees, and not otherwise."

According to the record, whatever banking arrangement was had was originally effected by Goodall himself. He engineered the entire matter and gave all the instructions with regard thereto. Defendant never received as much as a word or a scratch of the pen from plaintiff. *Vide* the testimony of the defendant's officer, Mockler:

"Q. And you had no instructions or directions from anybody representing the White-Dulany Co. except Mr. Goodall in the handling of that business? A. No, sir."

Again:

"Q. What were you undertaking to do under that arrangement? A. Well, to cash all the White-Dulany drafts that came in over the counter.

"Q. To cash them? A. Yes, sir."

Again:

"Q. And whom would you credit? A. Well, whatever the credit was for."

And again:

"Q. Mr. Goodall made arrangements whereby drafts drawn by him on the White-Dulany Co. in Seattle would be cashed by your bank? A. Yes, sir.

"Q. And under that arrangement you undertook to cash drafts on presentation? A. Yes, sir."

And yet again:

"Q. How did you know what to do with it? A. We just—whatever he told us.

"Q. Well, I say, you followed his instructions in applying the money? A. Yes, sir."

As between plaintiff and defendant, under such conditions, as regards banking arrangements, that Goodall was plaintiff's agent is not debatable. Notwithstanding plaintiff's positive allegations aforementioned, Goodall did pay certain auto expenses, salary and storage charges by drafts drawn by himself on plaintiff, and by plaintiff approved and paid. Under the system employed, Goodall was to report every transaction, and accompany it with a receipt or voucher. These would reach the Seattle office from three to five days before the arrival of the draft drawn by Goodall to cover the transaction. When the drafts complained of reached the Seattle office, they had not been preceded by any such receipt or voucher. Nevertheless, the principal paid them, with never a word of warning to the defendant Craigmont Bank which was handling the proceeds in strict conformity with its only instructions.

This went on for more than a twelve-month. The sum and substance of the trouble is this: Plaintiff trusted Goodall; Goodall betrayed it. The bank trusted Goodall; Goodall deceived it. Which of these innocent parties is to suffer? Plaintiff knew that Goodall was disobeying orders: the bank did not; and, had plaintiff done what it should have done, either refused to pay the unexplained draft and

notify the bank or have had one auditing at least during a period of nearly twenty months, it would not have fallen into the position it now occupies.

But, says the plaintiff, an audit would not have disclosed any peculation. Rather unconvincing logic, when a simple tabulation would have determined what had been paid out and what had been accounted for! On the facts, plaintiff is effectually foreclosed, not only by its own negligence, but by reason of its failure to make out a case.

This court refuses the proposition that the mere switching of trust funds by a fiduciary to his own personal account imposes upon the depository bank any duty whatever. Unless the bank has actual knowledge of the agent's wrongful purpose, or is possessed of knowledge which would put a prudent man on guard, it is not compelled to play the sleuth and engage a staff of detectives to shadow every trustee with whom it does business. Fraud is never to be presumed. Can the naked switching of a trust fund to the fiduciary's personal account arouse justified suspicion? No! *Honi soit qui mal 'y pense.* (*Farmers' Bank of Alamo, Ga., v. United States F. & G. Co.,* 28 Fed. (2d) 676.)

If a fiduciary has authority to draw a draft, he has the power to obtain the money for the benefit of his principals; and, unless the bank has knowledge to the contrary, it has the right, from its previous course of business, to presume and believe that he was acting for his principals in having the draft cashed, and that he intended using the money for his principals, and not for himself. No better statement of the rule has appeared than that of Judge Hawkins in his concurring opinion in the case just cited:

"I do not believe it was any of the bank's business, and it did not have to inquire or act in the matter one way or the other, so long as the checks were correctly drawn, for there was no privity between the bank and the beneficiary of the trust."

Our present Fiduciary Act, chap. 217, Laws of 1925, p. 393, sec. 6, expressly declares this very immunity, and while enacted after the transactions complained of, it but

announces the weight of progressive and informed authority theretofore in force elsewhere.

In order to prove its case, it was incumbent for plaintiff to show that defendant received the deposit with actual knowledge that Goodall was committing a breach of his obligation as agent in making such deposit, or with knowledge of such facts that its action in receiving such deposit amounted to bad faith. Plaintiff, however, submitted proof of neither.

It is urged that the judgment of dismissal entered was erroneous; that, instead, defendant bank should have been put to its proof, necessitating regular findings and judgment. This was wholly unnecessary. A jury trial had been waived; and the Court sat as the sole trier of the facts. All the facts were before it, including the positive testimony of the witness, Mockler, as follows:

"Q. Did you have any knowledge prior to May 25, 1925, that Mr. Goodall was misappropriating or misapplying the funds of the White-Dulany Co.? A. No, sir.

"Q. Did you have any suspicion to that effect? A. No, sir."

Upon the showing made, the court having determined that the plaintiff had failed to make its case, it would have been an idle gesture to have required defendant to reiterate under the guise of defense what had already been proved.

Judgment affirmed. Costs to respondent.

Budge, C. J., and Givens and Wm. E. Lee, JJ., concur.

HARTSON, D. J., Dissenting.—The action is for conversion of the proceeds of certain drafts drawn on appellant by its agent and cashed by respondent. Evidence was introduced by appellant to show that the White-Dulany Company is a Washington corporation engaged in the grain business, with its principal place of business in Seattle, and an office in Spokane in charge of a field superintendent whose territory includes northern Idaho. Since 1918 it has bought grain in the vicinity of Craigmont, through its agent James

Roy Goodall who reported all purchases to the Spokane office. The method of buying was in this manner: after receiving the market price, the agent conferred with sellers of grain, and upon agreement as to price would buy, giving the seller, either directly or through respondent bank, a draft upon appellant payable through any of several designated Seattle banks, and signed ''The White-Dulany Company by Roy Goodall, Buyer.'' Coincidentally the agent also prepared, in triplicate, a voucher giving the history of the transaction, with name of seller, warehouse ticket number, quantity, grades and variety of wheat, prices and amounts of any draft or drafts issued on the purchase. The original voucher was mailed to the Spokane office, the duplicate to Seattle with the grain tickets, and the triplicate was retained at Craigmont. Sometimes payment was made by several drafts on a single purchase, as in f. o. b. purchases, where the vendor requested it, or in case of errors in computation.

Goodall personally arranged with respondent to cash the drafts. Prior to September, 1923, the Vollmer Bank at Craigmont had handled the transactions, but due to some dissatisfaction Goodall changed to the respondent under an arrangement to cash drafts upon presentation. The vouchers and drafts were on printed forms prepared by appellant. Respondent honored the drafts as cash items. In some instances the drafts came to the bank from the seller with the latter's own local draft attached, while in other instances the seller drew on appellant through respondent and Goodall called at the bank and gave it a company draft and took up the seller's draft. In each case the bank placed the company draft in outgoing remittances, charged to a correspondent bank, and credited the amount to the grower or seller. These transactions were large in number, aggregating over a half million dollars. In no instance was a draft made payable to Goodall personally. Between October 18, 1923, and November 10, 1924, when the peculations began, Goodall drew 444 drafts, all payable to respondent, for a total of over $260,000. Between November 12, 1924, and May 9,

1925, he drew 115 drafts, likewise payable to respondent, for a total of over $96,000. And between September 10, 1923, and April 20, 1925, he drew 440 drafts, payable to various sellers, for a total of over $170,000, all of them passing through respondent. These transactions all occurred within a period of less than twenty months.

On or about November 12, 1924, Goodall made and executed a company draft for $338.06, payable to the order of respondent, presented it to the bank, and the latter, without inquiry or investigation as to his authority, and at his request, paid him cash or its equivalent in the sum of $122.56, and credited the balance to a personal account of Goodall's, which was opened at the time. At intervals thereafter and until about March 26, 1925, Goodall presented eleven other drafts, in various amounts, under like circumstances, payable to respondent, the entire sum aggregating $1,108.12, and the funds were credited to Goodall personally. The diversions were concealed from appellant because Goodall bought grain at one price, billed the company at a slightly higher price, and took the difference. Nothing on the face of the voucher, draft or grain ticket would indicate to appellant that any of the proceeds had been paid to Goodall or credited to his private account. The transaction of November 12, 1924, was the first time Goodall had asked for personal credit from respondent on any of the drafts. His salary and expenses were paid by checks of the company which passed through the bank and of which it had notice.

About the middle of May, 1925, appellant received its first knowledge that the proceeds of these drafts had been diverted, prior to which it had no direct communication with respondent.

Trial was had before the court without a jury. At the close of plaintiff's case respondent moved to dismiss on the ground, first, that the complaint states no cause of action; second, that the facts shown constitute no cause of action, afford no ground for relief, and disclose no liability on the

part of defendant. The motion was granted, and judgment of dismissal entered, from which appeal is taken.

Insufficiency of the complaint to state a cause of action is not ground for nonsuit. (*Mole v. Payne*, 39 Ida. 247, 227 Pac. 23.)

On motion for nonsuit, respondent, for the purpose of the motion, is deemed to have admitted all the facts of which there is any evidence, and all the facts which the evidence tends to prove. (*Coulson v. Aberdeen-Springfield Canal Co.*, 39 Ida. 320, 227 Pac. 29.)

It is the position of appellant that the form of the drafts imported to respondent that appellant was the owner of the funds represented, and that respondent was put upon inquiry and became liable for wrongfully diverting the funds to the agent's personal use; that every agency is subject to the legal limitation that it cannot be used for the personal benefit of the agent; and that the facts in evidence for the appellant were sufficient to justify submission to the court of the question as to whether respondent had notice that Goodall was violating his agency and using the funds for unauthorized purposes. The respondent, however, contends that the evidence makes no *prima facie* case of conversion, but if anything must rest upon some breach of contract which is not established; that no conversion can possibly exist in these transactions, since respondent bought the drafts with its own money, and thereby became the owner of the paper.

When Goodall presented to respondent a draft drawn by appellant "by Roy Goodall, Buyer," upon itself, to the order of respondent, the form of the draft imported that the money represented by it was the property of appellant, and that the White-Dulany Company, not Goodall, was paying it to respondent, that Goodall was depositing in his personal account funds of the appellant company; that he was using money entrusted to him as an agent for his personal advantage. (*Ward v. City Trust Co.*, 192 N. Y. 61, 84 N. E. 585; *Gerard v. McCormick*, 130 N. Y. 261, 29 N. E. 115, 14 L. R. A. 234; *Hathaway v. County of Delaware*,

185 N. Y. 368, 372, 113 Am. St. 909, 78 N. E. 153, 13 L. R. A., N. S., 273; *Niagara Woolen Co. v. Pacific Bank,* 141 App. Div. 265, 126 N. Y. Supp. 890; *Bischoff v. Yorkville Bank,* 170 App. Div. 679, 156 N. Y. Supp. 563; *Sims v. United States Trust Co.,* 103 N. Y. 472, 9 N. E. 605; *Bristol Knife Co. v. First National Bank,* 41 Conn. 421, 19 Am. Rep. 517; *Bowles Co. v. Clark,* 59 Wash. 336, 109 Pac. 812, 31 L. R. A., N. S., 613; *Bjorgo v. First National Bank,* 127 Minn. 105, 149 N. W. 3, L. R. A. 1915B, 287; *Bank of Venice v. Clapp,* 17 Cal. App. 657, 121 Pac. 298; *Newton v. Guerin,* 279 Fed. 256.) Had the bank then made an investigation, the real situation would have been disclosed, and the loss sustained by the appellant prevented. The bank being in possession of certain information, was chargeable with a knowledge of all facts which an inquiry suggested by such information would have disclosed. (*Rochester & C. T. R. Co. v. Paviour,* 164 N. Y. 281, 58 N. E. 114, 52 L. R. A. 790.)

All of the diverted drafts were in the same form, namely, drawn directly to the order of the respondent bank, indorsed by it, and then placed to the credit of the personal account of Goodall. Emphasis is added by the fact that in all the previous transactions with respondent Goodall had in no single instance deposited the proceeds of these drafts to his own account. It would seem that what the agent did here was the same in effect, so far as the bank is concerned, as if Goodall had drawn these drafts in his own favor, and indorsed them for deposit in his own account. Had that been done, however, the payment by appellant of the drafts so made payable to Goodall would have constituted a most emphatic assertion by it that Goodall was authorized to draw such drafts payable to his own order. (*Havana Cent. R. Co. v. Knickerbocker Trust Co.,* 198 N. Y. 422, 92 N. E. 12, L. R. A. 1915B, 720.) By drawing in favor of the bank Goodall prevented appellant from discovering the fact that the bank was paying the proceeds to Goodall, and relieves appellant from the estoppel that would result from such representation.

Respondent, by its motion for nonsuit, conceded that Goodall was appellant's agent, having power only to sign drafts for grain purchases upon appellant, that he signed drafts in its name in effect to his own order without authority, and deposited these drafts with respondent for his own use; that respondent received these drafts for the defaulting agent's individual account, collected the proceeds thereof, and placed the same to the defaulting agent's individual credit, and subsequently paid out on Goodall's checks the amount of such deposits. It is well established that trust funds do not lose their character as such by being deposited in a bank by the trustee to his own account. And where the circumstances are such that the bank is chargeable with notice that the depositor is violating his trust, it is liable for paying out the fund to one who is not entitled thereto. (7 C. J., pp. 644, 645.) On the face of the transactions in question Goodall was abstracting money from his principal to be credited to his own account with respondent. This should have been apparent to the officers of the respondent bank. By these transactions respondent, as to Goodall, became owner of the drafts and the proceeds, and became personally indebted to Goodall individually therefor. Respondent is chargeable with notice that appellant's money was being wrongfully taken from it and transferred to Goodall.

Every agency is subject to the legal limitation that it cannot be used for the benefit of the agent himself, or of any person other than the principal, in the absence of an agreement that it may be so used; and, as this is a matter of law, and not of fact, all persons must take notice of it. (21 R. C. L. 910.) An agent authorized to make negotiable paper cannot bind his principal as to third persons if the third person knows, or if the transaction shows upon its face, that the agent makes the paper for his own use, for these are acts that are not authorized, and on their face carry to the third person knowledge of that fact. And if the paper is made payable to the agent himself, it should put third persons on guard as to the agent's author-

ity and the purposes for which he is using his principal's credit. (2 C. J., pp. 642, 643.) Upon this principle it was held, in *Anderson v. Kissam,* 35 Fed. 699, that a purchaser of commercial paper made by an agent cannot acquire any title to it as against the principal, unless he can show that it was made by the agent upon due authorization; and when he knows that the agent has made it in the name of the principal for his own use, he must be prepared to show that special authority in that behalf was delegated by the principal, and cannot rely upon the implied or ostensible authority of the agent to make such paper in the ordinary business of the principal; that it having been shown that the agent had no authority to make the checks, and that the checks were paid by the bank upon which they were drawn, the defendants were *prima facie* liable in an action of trover for the face amount of the checks. That case also holds that if the defendant acquired title to the checks as against the plaintiff bank, of course they acquired title to the proceeds, and, if they were *bona fide* purchasers, their title was perfect; but otherwise they became liable for the proceeds as for a conversion. (See *Lamson v. Beard,* 94 Fed. 30, 45 L. R. A. 822; *Langlois v. Gragnon,* 123 La. 453, 49 So. 18, 22 L. R. A., N. S., 414; *Rensselaer Valve Co. v. National Bank of Commerce of Seattle,* 129 Wash. 253, 224 Pac. 673; *Farmers' Loan & Trust Co. v. Fidelity Trust Co.,* 86 Fed. 541; *Milton v. Johnson,* 79 Minn. 170, 81 N. W. 842, 47 L. R. A. 529; *Oklahoma State Bank v. Galion Iron Works & Mfg. Co.* (8th C. C. A.), 4 Fed. (2d) 337; *Parks v. Knickerbocker Trust Co.,* 137 App. Div. 719, 122 N. Y. Supp. 521; *Buena Vista Oil Co. v. Park Bank of Los Angeles,* 39 Cal. App. 710, 180 Pac. 12; *Wagner Trading Co. v. Battery Park Nat. Bank,* 228 N. Y. 37, 9 A. L. R. 340, 126 N. E. 347, affirming 184 App. Div. 885, 170 N. Y. Supp. 1117.)

The evidence was sufficient to go to the court upon the question of notice to the bank, and there was error in granting the motion for dismissal and entering judgment thereon.