SCOTTSBLUFF NATIONAL BANK, A CORPORATION, APPELLANT, v. BLUE J FEEDS, INCORPORATED, A CORPORATION, APPELLEE.

54 N. W. 2d 392

Filed July 11, 1952. No. 33184.

*Davis, Stubbs & Healey,* and *Richard D. Wilson,* for appellant.

*Young, Williams & Holm,* and *James H. Anderson,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

The Scottsbluff National Bank, hereinafter designated as plaintiff or the bank, brought this action at law against Blue J Feeds, Incorporated, hereinafter designated as defendant or the corporation, to recover upon a promissory note for $30,000. The note represented the execution, renewal, and subsequent consolidation and renewal of two corporate notes, one for $20,000, originally dated July 2, 1949, and the other for $10,000, dated August 3, 1949. Defendant admitted liability with respect to the $20,000 item but denied liability with respect to the $10,000 item, primarily upon the ground that the proceeds therefrom were not credited by the bank to defendant's account therein, but, as requested by Frank R. Warden, defendant's vice president, they were unlawfully, without any authority or inquiry with relation thereto, credited by the bank to the personal account of

Frank R. Warden for his own use and purposes. After hearing upon the issues, jury waived, whereat evidence was adduced, the trial court rendered a judgment in favor of plaintiff for $20,000 with interest at five percent from March 27, 1950, upon defendant's admitted liability, but otherwise denied liability of defendant upon the $10,000 item, and, with respect thereto, rendered a judgment in favor of defendant. The entire controversy here relates to such $10,000 item. Plaintiff's motion for new trial was overruled, and it appealed, assigning in effect that the findings of fact, conclusions of law, and judgment based thereon were not sustained by the evidence but were contrary thereto and contrary to law. We conclude that the assignments should not be sustained.

It is elementary that in a law action such as this, tried without a jury, findings of the court have the effect of a verdict of a jury, and judgment thereon will not be disturbed unless clearly wrong. Cotner College v. Estate of Hester, 155 Neb. 279, 51 N. W. 2d 612.

The relevant facts are not in dispute. Most of them were actually stipulated. Insofar as important here, they were as follows: Defendant corporation was originally, from June 1936 to January 1947, a partnership, composed of John R. Jirdon and Frank R. Warden, who as such engaged in the grain and feed business at Gering, Nebraska. Warden was sole manager of the business and handled its fiscal affairs. Jirdon was not ordinarily consulted except upon matters of policy. Such partnership had a deposit or checking account at plaintiff bank beginning in 1945. Prior thereto, its fiscal affairs were handled at the Live Stock National Bank in Omaha. During its existence as such, the partnership itself made no borrowings from plaintiff. However, during such period Warden, who also had an account at plaintiff bank, personally borrowed money from plaintiff for the partnership and himself, but there was no evidence that he ever paid any of his personal indebtedness to plain-

tiff with a partnership check. The partnership business prospered, and the capital investment of both Jirdon and Warden increased substantially. On such investments they each received seven percent interest. Thus, from June 1936 until January 1947, Warden was trusted by Jirdon, and during all of such period the record does not disclose any defalcation of partnership funds ·by Warden.

On January ·2, 1947, they formed defendant corporation, with John R. Jirdon, president, Frank R. Warden, vice president, and R. D. Hildebrandt, secretary-treasurer. The secretary-treasurer had only a nominal interest in the corporation. Eight hundred shares of paid-up capital stock were issued for a par value of $100 each. Out of such shares, 240 were issued to Warden and 160 to his relatives. The corporation, on February 1, 1947, had $64,651.55 of surplus and undivided profits. Its property statement of January 2, 1950, showed capital stock, $80,000, with surplus and undivided profits of $148,654.50. Thus, it was concededly always entirely solvent, had excellent credit, and no creditors are here involved in any manner.

After its formation, the corporation designated plaintiff as its corporate depositary, opened an account therein, and established credit with such bank. The corporation deposited $50,000 from other sources, and transferred $40,000 from the partnership account to the corporation account in plaintiff bank. On January 15, 1947, defendant corporation tendered and delivered to plaintiff its own duly prepared, adopted, and certified corporate resolution which defined the authority of Warden and the bank with relation to funds of the corporation to be handled by the bank. It was prepared on a printed form of the Live Stock National Bank of which Jirdon was then a director. Insofar as· important here, it provided: "(1) Be It Resolved, that THE SCOTTSBLUFF NATIONAL BANK OF SCOTTSBLUFF Nebraska, be and hereby is designated a depositary *in which the funds*

of this Corporation may be deposited by its officers, agents, and employes, and that the Vice-President F. R. Warden, * * * shall be and * * * hereby is authorized to endorse for deposit or negotiation any and all checks, drafts, notes, bills of exchange, and orders for the payment of money, either belonging to or coming into the possession of this Corporation. * * * (2) Be It Further Resolved, that the Vice-President F. R. Warden * * * of this Corporation * * * (is) authorized to SIGN ANY. AND ALL CHECKS, DRAFTS, AND ORDERS, including orders or directions in informal or letter form, against any funds at any time standing to the credit of this Corporation with the said Bank, and/or against any account of this Corporation with the said Bank, and that the said Bank hereby is authorized to honor any and all checks, drafts and orders so signed, including those drawn to the individual order of any such officer and/or other person signing the same, without further inquiry or regard to the authority of said officer(s) and/or other person(s) or the use of said checks, drafts and orders, or the proceeds thereof. (3) Be It Further Resolved, that the PRESIDENT AND/OR VICE PRESIDENT, singly or jointly of this Corporation (are) * * * authorized to borrow from time to time on behalf of this Corporation from the said Bank such sums of money for such time and upon such terms as may to them, or any of them, seem advisable, and to execute in the name of the Corporation notes, drafts, or agreements for the re-payment of any sums so borrowed, * * *." (Italics and numerals supplied.) Concededly, insofar as important here, the resolution was never rescinded or modified as provided therein.

After incorporation, Warden continued to manage the business and fiscal affairs of the corporation and transacted defendant's business with the bank in the manner authorized by the aforesaid resolution, with certain exceptions, one of which was the transaction here involved.

In that connection, on July 2, 1949, Warden borrowed

$20,000 from plaintiff and executed a corporate note therefor in which the bank was payee. The proceeds of such loan were deposited in defendant's account. However, neither the fact of the borrowing nor of the deposit as such appeared in any form on defendant's corporation books, except that on the same day Warden, for whom no provision had been made for salary, falsely credited his personal corporate drawing account with that amount on defendant's books. Such $20,000 is the item for which defendant admitted liability.

Defendant also had a branch office in Casper, Wyoming, where Warden also had a personal corporate drawing account on the books of defendant corporation. Daily and monthly reports were sent to the office at Morrill where Jirdon and Hildebrandt lived. At first such reports were carefully examined. However, thereafter over a considerable period of time, having confidence in Warden's integrity, they simply checked total sales and volume. Such reports related solely to the operations at Gering and not at Casper, from which none were received. The daily reports showed deposits in a lump sum, and the balance in defendant's account, without any listing of individual checks. Over a period of time, Warden cashed numerous corporate checks, until his personal corporate accounts in both Gering and Casper were greatly overdrawn, but they are not directly involved here. The disposition of two such check transactions in the light of paragraph (2) of the resolution, which with respect thereto gave Warden and the bank practically unlimited authority without the necessity of inquiry by the bank with regard to the use of the proceeds thereof, will be found in a companion case, Blue J Feeds, Inc. v. Scottsbluff Nat. Bank, *post* p. 84, 54 N. W. 2d 404.

The following transaction constitutes the subject matter of the instant case. On August 3, 1949, Warden again went to plaintiff bank and borrowed $10,000, executing and delivering to it a corporate note therefor in which

the bank was payee. At that time, however, Warden instructed an officer of the bank to deposit all the proceeds of such loan in his own personal account. Such officer, a vice president of the bank, well knowing that Warden was so personally receiving the proceeds, complied with such instructions without further inquiry, and himself made out and delivered to Warden an initialed bank deposit slip and caused all of the proceeds to be deposited in Warden's personal account instead of defendant's account. All previous borrowings from plaintiff by defendant upon corporate notes had been deposited to defendant's corporation account. There were at least nine such previous borrowing transactions, for a total of $130,000, which had all been previously deposited in defendant's account. The instance here involved was the one and only borrowing by Warden upon defendant's corporate notes in which the proceeds were deposited to any account except the corporation's account. The vice president of the bank himself so testified.

On the same day but not at the same time as the borrowing transaction, and not as a part thereof, Warden wrote a check on his personal account for $6,000, which he deposited with several others in defendant's corporate account, and credited his corporate drawing account, then overdrawn several thousand dollars, with that amount. Be that as it may, Warden's bank statement for August 1949 shows that he paid out the entire $10,000 for his own use and purposes during that month, and in that connection plaintiff makes no claim that the $6,000 then credited to Warden's account with defendant was a benefit to the corporation out of the proceeds of the $10,000 loan.

On September 30, 1949, the $20,000 note dated July 2, 1949, was renewed by Warden, who paid the interest to plaintiff with his own personal check. It was likewise again renewed by him on November 29, 1949. On November 1, 1949, the $10,000 note of August 3, 1949, was also renewed by Warden, who paid the interest thereon

to the bank with his own personal check. It was likewise again renewed by him on December 31, 1949. On February 1, 1950, however, Warden consolidated the two notes into one for $30,000, and paid the interest to plaintiff thereon with a corporate check. That note was likewise renewed by him on March 27, 1950. It is the note upon which plaintiff predicated this action.

The record discloses that notice of maturity of notes given to the bank in the corporate name were customarily sent by plaintiff to Gering where Warden was in charge, and concededly, if he received such notices they were destroyed by him. There is no evidence that any of defendant's officers other than Warden ever had any knowledge of the $10,000 note transaction until June 24, 1950, and no record of it ever appeared in defendant's corporation books and records.

After Warden did not call at the bank to renew or pay the note which matured on June 1, 1950, plaintiff tried to telephone Warden but he could not be contacted. Thereafter, on June 24, 1950, just two days before Warden's death, the bank called Hildebrandt, secretary-treasurer, at Morrill about the $30,000 note, who replied that they had no record of such a note or indebtedness. Prior thereto, the bank never made any inquiry of any officer of the corporation except Warden concerning the transaction.

On January 2, 1950, at the annual meeting of the corporation, Jirdon noticed that the balance sheet indicated that Warden's drawing account with the corporation was overdrawn some $20,528.48. This was accomplished by the cashing of corporate checks by Warden, which was authorized by paragraph (2) of the corporate resolution, and the false entry as aforesaid of a $20,000 credit in his drawing account on July 2, 1949. It was then explained by Warden that he had thus overdrawn to pay obligations owing to others, whereupon he offered to and did put up 240 shares of stock to secure payment of a $17,000 note then executed and delivered by him to defendant as

payee. The stock certificates showed that they had been endorsed to the corporation about a month before, which Warden explained as having been done by him to protect the corporation. He then owned an additional 80 shares, and agreed to pay and make up the balance of $3,528.48 in the future. The stock was then worth $200 a share and ample security. However, the fact is that at that time the directors knew nothing about the note transactions here involved, and, of course, they were not in any manner considered or included in the aforesaid settlement with Warden. The transactions here involved were not discovered until June 24, 1950, and the full extent of corporate check withdrawals by Warden was only discovered some time thereafter by extensive audits supplemented by outside information not obtainable from defendant's records. At the time of Warden's death on June 25, 1950, the corporation's balance sheets showed nothing owing the plaintiff bank.

Plaintiff contended that the resolution aforesaid authorized the bank to loan $10,000 upon the corporate note executed and delivered to it by Warden, and to deposit the same in his personal account. Plaintiff also argued that by virtue of the fact that it received no benefit, but suffered a detriment as consideration for the transaction, and that by application of estoppel and innocent party doctrines, defendant would be liable for the $10,000 transaction. We conclude otherwise.

Paragraph (2) of the resolution, it will be noted, related to the authority of Warden to "SIGN ANY AND ALL CHECKS, DRAFTS, AND ORDERS, including orders or directions in informal or letter form, *against any funds at any time standing to the credit of this Corporation with the said Bank, and/or against any account of this Corporation with the said Bank,* * * *." (Italics supplied.) As a matter of course, a borrowing by corporate note which was deposited solely in Warden's account, could not upon any theory be construed as a check, draft, or order "against any funds at any time standing to the

credit of this Corporation with the said Bank," or "against any account of this Corporation with the said Bank * * *."

The proceeds of the loan never were an account of the corporation with the bank, or a fund standing to the credit of the corporation. In fact, it was initially the bank's own money, which after the transaction appeared as a fund standing to the credit of Warden personally. Paragraph (2) of the resolution had no relation whatever to borrowing by the corporation. Rather, borrowing transactions were authorized and controlled by paragraphs (1) and (3) of the resolution. Paragraph (1) specifically designated plaintiff as "a depositary in which the funds of this Corporation may be deposited by its officers, agents, and employees, * * *." Paragraph (3) specifically provided that Warden was authorized to borrow money "in the name of the Corporation" but only "on behalf of the Corporation." It clearly gave to the bank no authority to loan money "in the name of the Corporation" and deposit the proceeds in Warden's personal account instead of the account of the corporation.

In that connection, the general rule is: "Express authority to execute or indorse commercial paper in the principal's name will, in the absence of anything indicating a different intention, be construed as confining the authority of the cases to the execution and indorsement of such paper in the transaction of the principal's business and for the benefit of the principal. Such authority does not include authority to draw or indorse negotiable paper for the benefit or accommodation of any other person; authority to sign accommodation paper or as security for a third person must be specially given. Nor does express authority of the nature in question allow the agent to make or indorse negotiable paper for his own use and behalf." 2 Am. Jur., Agency, § 176, p. 140. See, also, 2 C. J. S., Agency, § 112, p. 1306; 2 C. J., Agency, § 285, p. 641.

Therefore, when the transaction here involved was attempted, the bank was put upon notice and there was im-

posed upon it a duty of inquiry and investigation to ascertain its own authority and that of Warden. This was not done. If it had done so, it would have readily learned that Warden had no authority to borrow money in the name of the corporation for his own uses and purposes. It knew that such funds had never theretofore been deposited in Warden's personal account. The bank's position was the same as if it had actual knowledge of such lack of authority, either by the written resolution or otherwise, because it was charged upon the face of the resolution, Warden's stated interest in the transaction, and the note itself with knowledge of the facts, which an inquiry would have developed. Kuhns v. Live Stock Nat. Bank, 137 Neb. 459, 289 N. W. 893; American Surety Co. v. Smith, Landeryou & Co., 141 Neb. 719, 4 N. W. 2d 889; Bank of Benson v. Gordon, 103 Neb. 508, 172 N. W. 367; McCann v. State, 4 Neb. 324.

It is generally understood that: "Unless otherwise agreed, authority to act as agent includes only authority to act for the benefit of the principal." Restatement, Agency, § 39, p. 98. In that connection: "If a third person has notice of a limitation of an agent's authority, he cannot subject the principal to liability upon a transaction with the agent in violation of such limitation." Restatement, Agency, § 166, p. 406. As stated in comment (a) to this section: "Any substantial departure by an agent from the usual methods of conducting business is ordinarily a sufficient warning of lack of authorization." Again, in comment (b) to this same section, referring to § 39 *supra,* it is said: "If, therefore, the third person has reason to believe that the agent is acting for his own benefit, he cannot subject the principal to liability upon a contract which in fact is unauthorized." Again, in comment (c) to this same section it is said: "Where circumstances indicate that the agent may be acting in fraud of the principal, a person dealing with the agent is required to exercise care in investigation in order to hold the principal liable."

Also, as stated in Restatement, Agency, § 167, p. 408: "If a third person dealing with an agent has notice that the agent's authority is created or described in a writing which is intended for his inspection, he is affected by limitations upon the authority contained in the writing, unless misled by conduct of the principal."

In Employers' Liability Assurance Corp. v. Hudson River Trust Co., 250 App. Div. 159, 294 N. Y. S. 698, citing many authorities, the court in dealing with constructive notice and the duty to inquire, imposed by the very form of withdrawals and deposits, distinguished between cases involving: (1) Dealings of a bank with trustees and representatives of estates, such as relied upon by plaintiff in this case; (2) dealings of a bank with public officers; and (3) dealings of a bank with officers or agents of a private corporation such as that at bar. With regard to the third type, the court said: "In the case of an officer or agent of a private corporation dealing with its funds the authority of such officer or agent is not known to all but depends upon the authority conferred upon him by the corporation which he represents. In such class of cases a bank knowingly receiving corporate funds for deposit in the individual account of such officer or agent is held to be under the duty of making inquiry to ascertain the extent of his authority in the transaction." See, also, Farmers' Loan & Trust Co. v. Fidelity Trust Co., 86 F. 541, 30 C. C. A. 247, 56 U. S. App. 729; First Nat. Bank v. Drovers' & Mechanics' Nat. Bank, 244 F. 135; Chase & Co. v. Norfolk Nat. Bank, 151 Va. 1040, 145 S. E. 725; Oklahoma State Bank v. Galion Iron Works & Mfg. Co., 4 F. 2d 337.

The fact that Warden might have accomplished the same result by another method without liability on the part of the bank is not controlling in this case, as argued by plaintiff. In Bank of Giles County v. Fidelity & Deposit Co., 84 F. 2d 321, it is said: "What it ought to have done is not what it did do, and it cannot escape

liability upon the mere conjecture that what did happen to the funds might have also happened had the bank not been derelict in its dealings with those funds."

Plaintiff argued that there was consideration for the note because the bank suffered a detriment, and that defendant was liable because plaintiff did not obtain any benefit from the transaction. We conclude otherwise. As a matter of fact, the bank did receive a benefit. It initially retained the funds credited to Warden in the bank. Over a long period of time, it collected a large amount of interest upon the loan, a benefit or income received out of the transaction, the very purpose for which the bank existed. We may assume, however, for purpose of argument only that it obtained no benefit, and arrive at the same result. It is elementary that consideration may be a detriment to the promisee as well as a benefit to the promissor. However, a negotiable instrument as between the parties requires a consideration the same as any other contract, and where there is no consideration, the original note and each successive renewal thereof is void, and such absence of consideration is a defense to the instrument. 7 Am. Jur., Bills and Notes, § 234, p. 926, §§ 247, 248, p. 941; § 62-128, R. R. S. 1943. Likewise, it is the rule that in order for a detriment to the promisee to constitute a valid consideration for a note or contract, it must have been within the express or implied contemplation of the parties and known to and agreed to by them. Blain v. Johnson, 201 Iowa 961, 208 N. W. 273; Bard v. Kent, 19 Cal. 2d 449, 122 P. 2d 8, 139 A. L. R. 1032; 1 Williston on Contracts (Rev. Ed.), § 102A, p. 326. Ordinarily a detriment to the promisee cannot be consideration for a note unless the party sought to be held is in some manner privy to the transaction. In other words, the borrowing on a note such as here, involved two elements: (1) Issuance of the note in the name of defendant corporation; and (2) delivery of the consideration to defendant, or it must appear that the detriment claimed

by delivery thereof to Warden was authorized by defendant, making it privy to the transaction. To hold otherwise would permit plaintiff, upon receiving the note, to give the proceeds to any stranger and thereby bind defendant. No such authority was ever given by defendant, and the detriment, if any, suffered by plaintiff was purely the result of its own lack of care and diligence in completing the transaction and disposing of the funds as it did for Warden's own use and purposes. In this case the business of the bank and the business of Warden, not that of defendant, was being promoted by the bank and Warden.

True, in some cases courts have laid emphasis upon the fact that the bank obtained a profit or benefit by the transaction to illustrate that they thereby actually aided the agent or trustee in a misappropriation of funds. The true test is not the procurement of a benefit by the bank by its initiative action, but the infliction of a loss of funds resulting from the presence of constructive notice or knowledge, requiring inquiry with regard thereto, and the obtaining of requisite authority, which was not done by plaintiff. In other words, the primary question is whether or not the bank with notice failed to inquire and thus actually aided Warden in misappropriating the fund, which in fact should have been credited to the account of the corporation. Hale, Cabot and Buck v. Windsor Savings Bank, 90 Vt. 487, 98 A. 993. Other cases heretofore cited also support such conclusion.

We come then to estoppel. In that connection, the proximate result of the situation presented here was wholly the lack of any care and diligence by plaintiff bank in accepting the note and depositing the funds in Warden's personal account, without making any inquiry as required. The transaction involved was a single, strange, and unusual one, which never appeared upon defendant's books. It was concealed from defendant by Warden, and in fact it was concealed from defendant

by the bank, who was silent about either its execution or existence insofar as all other officers of the corporation were concerned, from August 3, 1949, until June 24, 1950, only two days before Warden's death. Defendant had a right and was not negligent in reposing confidence in Warden as a trusted agent, and continuing to do so until it received knowledge or information that he was untrustworthy. American Surety Co. v. Smith, Landeryou & Co., *supra*. When defendant did receive such knowledge, it was long after the transaction here involved had occurred, and the proceeds deposited in Warden's account had been spent by him for his own use and purposes. Any information obtained after August 3, 1949, would have served no purpose unless the transaction was subsequently ratified by defendant. That did not occur.

"To constitute an equitable estoppel, there must exist a false representation or concealment of material facts; it must have been made with knowledge, actual or constructive, of the facts; the party to whom it was made must have been without knowledge or the means of knowledge of the real facts; it must have been made with the intention that it should be acted upon; and the party to whom it was made must have relied on or acted upon it to his prejudice." Walker v. Ehresman, 79 Neb. 775, 113 N. W. 218. See, also, Peters Trust Co. v. Cranmore, 114 Neb. 491, 208 N. W. 635; State ex rel. Truax v. Burrows, 136 Neb. 691, 287 N. W. 178.

The above statement was quoted with approval in American Surety Co. v. Smith, Landeryou & Co., *supra,* which case is authority for the controlling conclusion here that plaintiff was itself negligent because it was put on inquiry by the very form of the transaction in the light of its authority prescribed in the resolution, but nevertheless failed to perform its duty. Such conclusion invokes application of the rule in American Surety Co. v. Smith, Landeryou & Co., *supra,* citing numerous cases, to the effect that defendant's estoppel

by negligence does not arise in favor of a plaintiff who itself was guilty of negligence.

As concluded in W. E. Richmond & Co. v. Security Nat. Bank, 16 Tenn. App. 414, 64 S. W. 2d 863: "The doctrine of equitable estoppel is well established. An essential element is the entire good faith and innocence of the party imposed on. An estoppel by representation cannot be claimed by one acting thereon, if he knows of, or has been put upon inquiry as to its falsity; and where one with a convenient opportunity to ascertain the real facts by the exercise of reasonable diligence neglects to do so after having been put upon inquiry, he will not be permitted to defeat another's just rights by urging an equitable estoppel based on his having acted to his disadvantage in relying upon that other's innocently mistaken representation regarding those facts, where such representation was not made for the purpose of inducing him so to act. Eyers Woolen Co. v. Gilsum, 84 N. H., 1, 146 A., 511, 64 A. L. R., 1196; Vineland v. Fowler Waste Mfg. Co., 86 N. J. Law, 342, 90 A., 1054, L. R. A., 1915B, 711."

In 19 Am. Jur., Estoppel, § 86, p. 741, it is said: "Good faith is generally regarded, however, as requiring the exercise of reasonable diligence to learn the truth, and, accordingly, estoppel is denied where the party claiming it was put on inquiry as to the truth and had available means for ascertaining it, at least where the element of actual fraud is absent." See, also, 21 C. J., Estoppel, § 130, p. 1129; 2 Pomeroy, Equitable Estoppel (4th ed.), § 810, p. 1662.

As stated in 31 C. J. S., Estoppel, § 103, p. 329, citing First Nat. Bank of Bridgeport v. First Nat. Bank of Hartington, 111 Neb. 441, 196 N. W. 691: "Furthermore, in accordance with well settled general principles governing equitable estoppels, no estoppel can arise where all the parties interested have equal knowledge of the facts, or where the party setting up the estoppel

is chargeable with notice of the facts, or is equally negligent or at fault."

As stated in Ricketts v. Scothorn, 57 Neb. 51, 77 N. W. 365, 73 Am. S. R. 491, 42 L. R. A. 794: "An estoppel in pais is defined to be 'a right arising from acts, admissions, or conduct which have induced a change of position in accordance with the real or apparent intention of the party against whom they are alleged.' Mr. Pomeroy has formulated the following definition: 'Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, or contract, or of remedy, as against another person who in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right either of property, of contract, or of remedy.' (2 Pomeroy, Equity Jurisprudence 804.)"

The fact is, however, that defendant did nothing voluntarily to induce the bank to change its position, and it never did so. Its position was that it had authority to so loan and deposit the money in the first instance. However, that authority did not exist, and upon first learning of the transaction, which had long theretofore been completed, defendant repudiated it. It cannot be said that plaintiff bank ever relied in good faith upon any subsequent conduct of defendant. It was not induced by defendant in any manner to refrain from learning the facts, as it was initially obligated to do, and saving itself from loss, if any.

In Scharman v. Scharman, 38 Neb. 39, 56 N. W. 704, this court held that: "To sustain an estoppel because of the omission to speak there must be both the specific opportunity and the apparent duty to speak. The party maintaining silence must have known that some one was relying thereon, and was either acting, or about to act, as he would not have done had the truth been told." See,

also, Smith v. White, 62 Neb. 56, 86 N. W. 930. In City of Lincoln v. McLaughlin, 79 Neb. 74, 112 N. W. 363, this court held: "In order to constitute an equitable estoppel by silence or acquiescence, it must be made to appear that the facts upon which it is sought to make the estoppel operate were known to the parties against whom the estoppel is urged."

It will be readily seen that since the note never appeared on defendant's books, and its existence was never known by it until June 24, 1950, the foregoing rules will not permit plaintiff to recover upon any theory of estoppel, by silence or otherwise.

In that connection, the general rule is that knowledge of an agent is imputed to his principal. The reason for the rule is to protect innocent third persons. However, there is an exception to the rule where the agent is engaged in an independent fraudulent scheme in behalf of his own interests and without the scope of the agency.

In Exchange Bank of Wilcox v. Nebraska Underwriters Ins. Co., 84 Neb. 110, 120 N. W. 1010, 133 Am. S. R. 614, this court said: "We think it may be regarded as well established that where an agent's duty to his principal is opposed to or even remotely conflicts with his own interest, or the interest of another party for whom he acts, the law will not permit him to act, nor will it hold his acts or his knowledge gained in such transaction obligatory upon his principal."

Also, as held in Koehler v. Dodge, 31 Neb. 328, 47 N. W. 913, 28 Am. S. R. 518: "A corporation is not chargeable with the knowledge nor bound by the acts of one of its officers in a matter in which he acts in behalf of his own interests, and deals with the corporation as a private individual, and in no way represents it in the transaction."

In this case, of course, neither Warden nor plaintiff bank was authorized to act in the manner in which they did, and the resulting transaction was not subsequently ratified by defendant, because it had no knowl-

edge of the material facts until long after it was completed, and upon the face of it Warden never purported to act for defendant, but only acted for himself. See 13 Am. Jur., Corporations, §§ 977, 978, p. 930.

There is another rule applicable here, which provides: "A principal is not estopped to deny the authority of his agent to perform a particular act, on the ground that it was within the agent's apparent authority, unless the authority to perform it was apparent to the person dealing with the agent, and by him relied on." First Nat. Bank v. Farmers & Merchants Bank, 56 Neb. 149, 76 N. W. 430.

As we have heretofore said, it was apparent upon the face of the transaction that Warden had no authority to borrow money from the bank in the name of the corporation for his own use and purposes, and the resolution gave the bank no authority to make such a loan. It was limited by the resolution to borrowing by Warden in the name of the corporation on behalf of the corporation.

Finally, plaintiff argued that it should recover upon the ground that where one of two innocent persons must suffer by the acts of a third, he whose conduct, act, or omission enabled such third person to occasion the loss must sustain it if the other party acted in good faith without knowledge of the facts and altered his position to his detriment. A mere reading of the contention in the light of what has been heretofore said discloses that it has no application in this case.

In State ex rel. Spillman v. Dunbar State Bank, 121 Neb. 528, 237 N. W. 684, it is said: "It is an old rule of law that, when one of two innocent parties must suffer, the one whose oversight or laches has made the occurrence of the event possible must suffer, rather than the one who is entirely without blame." See, also, 31 C. J. S., Estoppel, § 103, p. 325; 21 C. J., Estoppel, § 176, p. 1170; Apostoloff v. Levy, 174 N. Y. S. 828.

Generally the rule that as between two innocent

parties the loss should fall upon the one who made the loss possible protects only those who exercise ordinary care and caution in performance of duty. Hill Syrup Co. v. National City Bank, 129 Wash. 171, 224 P. 578.

In this case, plaintiff was put on notice by the transaction in the light of the resolution limiting its authority, which required inquiry before acting. It is not in the position of an innocent party, entitled to charge the loss against defendant. As stated in Ernst v. Searle, 218 Cal. 233, 22 P. 2d 715: "Here the injury never would have occurred had appellant properly performed the duty imposed upon it by law to investigate the authority of the agent with whom it was dealing."

The findings and judgment of the trial court substantially conformed with the foregoing facts, rules, and conclusions, and for the reasons heretofore stated, the judgment should be and hereby is affirmed.

AFFIRMED.